# EXHIBIT A

FILED
9/9/2020 12:12 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2020CH05784

10382869

FILED DATE: 9/9/2020 12:12 PM   2020CH05784

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

| | |
|---|---|
| BIRCH GOLD GROUP, LP, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| CERTAIN UNDERWRITERS AT | ) |
| LLOYD'S OF LONDON SUBSCRIBING | ) |
| TO POLICY NUMBER N184678, CHUBB | ) |
| UNDERWRITING AGENCIES LTD., AND | ) |
| TALBOT UNDERWRITING LTD., | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT

Plaintiff Birch Gold Group, LP ("Birch") for its Complaint against Defendants including

certain underwriters at Lloyd's of London subscribing to policy number N184678, Chubb

Underwriting Agencies, Ltd., and Talbot Underwriting Ltd. (collectively the "insurers"), alleges

as follows:

### Summary

1.     Birch purchased a directors and officers liability insurance policy from the

insurers which states that it covers any administrative investigations commenced by the service

of a subpoena.  Birch and its officers were later issued such a subpoena and requested that the

insurers provide a defense.  However, the insurers denied coverage.  Birch therefore seeks to

recover the defense costs it incurred and a declaration that the policy provides coverage for the

subpoena.

### Parties

2.     Birch is a limited partnership organized under the laws of the state of California

with its principal place of business at 3500 Olive Avenue, Suite 730, Burbank, California 91505.

12468081.1

FILED DATE: 9/9/2020 12:12 PM   2020CH05784

3.      Certain underwriters at Lloyd's of London subscribing to policy number N184678 are organized under the laws of the United Kingdom with a principal place of business at One Lime Street, London EC3M 7HA England.

4.      Certain underwriters at Lloyd's of London subscribing to policy number N184678 transact business in Illinois, United States of America.

5.      Chubb Underwriting Agencies, Ltd. is an insurance company organized under the laws of the United Kingdom with a principal place of business at 100 Leadenhall Street, London EC3A 3BP England.

6.      Chubb Underwriting Agencies, Ltd. transacts business in Illinois, United States of America.

7.      Talbot Underwriting Ltd. is an insurance company organized under the laws of the United Kingdom with a principal place of business at 60 Threadneedle Street London EC2R 8HP England.

8.      Talbot Underwriting Ltd. transacts business in Illinois, United States of America.

Factual Background

9.      Birch submitted a completed 21 page application for insurance with the insurers entitled Financial Institutions Risk Protector Application, dated November 17, 2017.

10.      On Birch's insurance application with the insurers, Birch's "primary nature of business" was listed as "GOLD, SILVER".

11.      In exchange for a premium payment made by Birch, the insurers issued a Private Company Management Liability Policy, number N184678, effective June 28, 2018 to June 28, 2019 (the "policy") to Birch.

12.      A copy of the policy is attached hereto as "Exhibit A".

FILED DATE: 9/9/2020 12:12 PM   2020CH05784

13.    Birch paid $31,460 in premium, taxes, and fees for the policy.

14.    Certain underwriters at Lloyd's of London agreed to the terms of the policy.

15.    Chubb Underwriting Agencies, Ltd. agreed to the terms of the policy.

16.    Talbot Underwriting Ltd. agreed to the terms of the policy.

17.    The policy includes the following language:

I.    INSURING AGREEMENTS

A.  Management Liability

If Management Liability coverage is purchased as indicated in Item 3 of the Declarations:

\* \* \*

2.    **Company** Reimbursement

The **Insurer** shall pay the **Loss** of the **Company** for which the **Company** has indemnified the **Insured Persons** and which the **Insured Persons** have become legally obligated to pay by reason of a **Claim** first made against the **Insured Persons** and reported to the **Insurer** during the **Policy Period** or, if elected, the **Extended Reporting Period**, for any **Wrongful Acts** taking place prior to the end of the **Policy Period**.

3.    **Company** Liability

The **Insurer** shall pay the **Loss** of the **Company** which the **Company** becomes legally obligated to pay by reason of a **Claim**.
. .

\* \* \*

II.    DEFINITIONS

When used in this **Policy**:

\* \* \*

D.    **Claim** means:

\* \* \*

- 3 -

FILED DATE: 9/9/2020 12:12 PM   2020CH05784

        6.        a civil, administrative or regulatory investigation against the **Insured**, commenced by the service upon or other receipt by the **Insured** of a written notice or subpoena from the investigating authority identifying the **Insured** as an individual against whom a civil, administrative or regulatory investigation or proceeding may be commenced;

\* \* \*

L.    **Insured** means:

        1.        any **Insured Person**;

\* \* \*

M.    **Insured Person** means any person who was, now is or shall become:

        1.        a duly elected or appointed director, trustee (excluding a bankruptcy trustee), officer or similar executive of the **Company**, and any member of the management board of a limited liability company;

\* \* \*

P.    **Loss** means the… D**efense Costs** which the **Insured** becomes legally obligated to pay on account of any **Claim** . . . for **Wrongful Acts** to which this **Policy** applies. . .

18.    The policy therefore should cover the defense costs for a subpoena identifying Birch and/or its officers as individuals against whom an administrative investigation may be commenced.

19.    On or about August 28, 2018, Birch and its officers were served with a subpoena that falls within the policy. The subpoena was dated August 28, 2018 and was accompanied by a cover letter (collectively the "Subpoena").

20.    The Subpoena involves an administrative investigation of Birch.

21.    The Subpoena involves an administrative investigation of Birch's officers.

- 4 -

FILED DATE: 9/9/2020 12:12 PM   2020CH05784

22.    The cover letter for the Subpoena is explicitly directed to Laith Alsarraf.

23.    The Subpoena is explicitly directed to Laith Alsarraf.

24.    Laith Alsarraf is an officer of Birch.

25.    The Subpoena states under its definitions that "[t]he term 'Birch Gold Group' includes but is not limited to Birch Gold Group, LP. . . and includes all of its current. . . officers".

26.    The Subpoena sought records from Laith Alsarraf.

27.    The Subpoena sought records from Birch's officers.

28.    The Subpoena contains matters that fall within the scope of coverage for the policy.

29.    Birch therefore sent a copy of the Subpoena to the insurers on September 10, 2018, and requested that coverage be provided under the policy.

30.    Shortly after September 10, 2018, the insurers received the copy of the Subpoena.

31.    However, the insurers denied coverage by letter dated November 2, 2018, and subsequent letters.

32.    Philip E. Cook at The Cook Law Firm on behalf of Birch ("Cook") sent a letter, dated October 9, 2018, to John Grimble at Oxford Insurance Brokers Ltd.

33.    Ralph A. Guirgis at Clyde & Co US LLP on behalf of the insurers ("Guirgis") sent a letter to Cook, dated November 2, 2018.

34.    Cook sent a letter to Guirgis, dated November 13, 2018.

35.    Guirgis sent a letter to Cook, dated November 30, 2018.

36.    Cook sent a letter to Guirgis, dated December 10, 2018.

37.    Guirgis sent a letter to Cook, dated January 3, 2019.

38.    Cook sent a letter to Guirgis, dated January 14, 2019.

FILED DATE: 9/9/2020 12:12 PM   2020CH05784

39.     Cook sent a letter to Guirgis, dated February 28, 2019.

40.     Cook sent a letter to Guirgis, dated March 1, 2019.

41.     Guirgis sent a letter to Cook, dated March 08, 2019.

42.     Guirgis sent a letter to Cook, dated May 30, 2019.

43.     After all of those letters, the insurers never accepted their duty to defend the Subpoena for Birch and its officers.

44.     Birch paid the defense costs for the Subpoena without any reimbursement from the insurers.

45.     To date, Birch has incurred significant attorneys' fees and out of pocket costs defending the Subpoena.

46.     In the policy, the insurers authorize the following to accept service of process: Patrick Kelly - Wilson, Elser, Moskowitz, Edelman & Dicker LLP, 555 S. Flower Street, Suite 2900, Los Angeles, CA 90071-2407.

<u>Count I – Breach of Contract</u>

47.     Birch incorporates all of the foregoing paragraphs.

48.     Birch and the insurers entered into a valid contractual arrangement through the policy.

49.     Birch fully performed its obligations under the policy.

50.     The policy requires the insurers to defend the Subpoena.

51.     However, the insurers breached the policy by failing to pay for the defense costs in responding to the Subpoena.

52.     As a result of the breach by the insurers, Birch has been damaged by incurring defense costs.

FILED DATE: 9/9/2020 12:12 PM   2020CH05784

53.     Birch therefore seeks a judgment against the insurers based on breach of contract for the defense costs Birch has incurred.

<u>Count II – Breach of Implied Covenant of Good Faith and Fair Dealing</u>

54.     Birch incorporates all of the foregoing paragraphs.

55.     There is an implied covenant of good faith and fair dealing in all contracts entered into in California.

56.     The insurers' actions constitute a breach of that implied covenant.

57.     As a result of the breach by the insurers, Birch suffered substantial damages.

58.     Birch therefore seeks a judgment against the insurers based on their breach of the implied covenant of good faith and fair dealing.

<u>Count III – Declaratory Judgment</u>

59.     Birch incorporates all of the foregoing paragraphs.

60.     Birch and its officers continue to incur defense costs for the Subpoena.

61.     The defense costs of Birch and its officers for the Subpoena should be covered by the policy.

62.     The insurers are not paying the defense costs for the Subpoena.

63.     An actual controversy has therefore arisen between Birch and the insurers.

64.     Birch seeks a declaration that the policy is required to cover the defense costs of Birch and its officers for the Subpoena.

<u>Count IV – Violation of Cal. Civ. Code § 3294</u>

65.     Birch incorporates all of the foregoing paragraphs.

66.     The insurers are guilty of oppression, fraud, or malice in the handling of Birch's claim and denial of coverage.

FILED DATE: 9/9/2020 12:12 PM   2020CH05784

67.     The insurers are therefore liable for punitive damages pursuant to California Civil Code Section 3294.

68.     Birch therefore seeks a recovery from the insurers for their violation of California Civil Code Section 3294.

Jury Demand

69.     Birch demands a trial by jury on all issues so triable.

WHEREFORE, Birch respectfully requests that this Court enter a judgment against the insurers for an amount to be proven at trial based on the insurers' breach of contract and/or breach of the implied covenant of good faith and fair dealing, for a declaration that the insurers must defend Birch and its officers for the Subpoena, for prejudgment interest, punitive damages, attorney's fees, costs, and such further relief as may be appropriate.

Dated: September 9, 2020

Respectfully submitted,

_____
Ray Hughes
The Hughes Firm, LLC
2027 West Division Street, Suite 122
Chicago, Illinois 60622
(708) 320-3336
ray@hughesfirmllc.com
Firm No. 64369
*Attorneys for Plaintiff Birch Gold Group, LP*

FILED DATE: 9/9/2020 12:12 PM   2020CH05784

# EXHIBIT A

FILED DATE: 9/9/2020 12:12 PM   2020CH05784

**1115
OXF**



| | |
|---|---|
| **UNIQUE MARKET REFERENCE:** | **B1115N184678** |
| **INSURED:** | **Birch Gold Group LP** |
| **TYPE:** | **DIRECTORS' AND OFFICERS' LIABILITY AND COMPANY REIMBURSEMENT INSURANCE** |
| **PERIOD:** | **From:**      **28th June 2018 (12.01am LST)** <br> **To:**       **28th June 2019 (12.01am LST)** |

Oxford Insurance Brokers Ltd is authorised and regulated by the Financial Conduct Authority
Registered Office | 2nd Floor | 6 Bevis Marks | London | EC3A 7BA
Registered in England and Wales No. 3599899

OXF1115
UNIQUE MARKET
REFERENCE: B1115N184678



**OXFORD**
INSURANCE BROKERS

**RISK DETAILS**

FILED DATE: 9/9/2020 12:12 PM   2020CH05784

| | |
|---|---|
| **POLICY NUMBER:** | **N184678** |
| **TYPE:** | Directors' and Officers' Liability and Company Reimbursement Insurance. |
| **INSURED:** | **Birch Gold Group LP** |
| **PRINCIPAL ADDRESS:** | 3500 Olive Avenue<br>Suite 730<br>Burbank<br>California 91505 |
| **PERIOD:** | From:  28th June 2018<br>To:      28th June 2019<br>Both days at 12:01am Local Standard Time at the principal address stated above. |
| **INTEREST:** | Management Liability (Insuring Agreement A. 1. and 2. only) - As per Policy Wording/Form attached hereto |
| **LIMITS:** | USD 2,000,000        any one claim and in the aggregate (including Defense Costs) |
| **RETENTION:** | Insured Person Liability:        Nil / USD 0<br>Company Reimbursement:      USD 50,000 each and every claim |
| **SITUATION:** | Worldwide |
| **CONDITIONS:** | **Wording/Form:**<br>ACE Advantage Private Company Management Liability Policy PF-14386/7 (9/03) - Insuring Agreements A. 1. and 2. only, as attached hereto.<br><br>**Riders, Clauses and/or Endorsements:**<br>As per Item 9. Of the Declarations and as attached hereto. |
| **NOTICES:** | LMA9098A (D-2) California Disclosure Notice<br>LMA9030 California Surplus Lines Notice 2<br>LMA9136 California Complaints Notice |
| **CHOICE OF LAW AND JURISDICTION:** | This insurance shall be governed by and construed in accordance with the laws of the State of California (as per the Choice of Law Clause), and each party agrees to submit to the exclusive jurisdiction of any competent court within the United States of America (as per the Service of Suit Clause). |
| **ANNUAL PREMIUM:** | USD 30,000 |



OXF1115
UNIQUE MARKET
REFERENCE: B1115N184678



FILED DATE: 9/9/2020 12:12 PM   2020CH05784

**PREMIUM**
**PAYMENT TERMS:**     LSW3001 Premium Payment Clause - 60 days.

**TAXES PAYABLE**
**BY INSURED AND**
**ADMINISTERED**
**BY INSURER(S):**     None.

**RECORDING,**
**TRANSMITTING &**
**STORING**
**INFORMATION:**     Where the Broker maintains risk and claim data / information / documents
the Broker may hold data/information/documents electronically.

**INSURER**
**CONTRACT**
**DOCUMENTATION:**     This document details the contract terms entered into by the insurer(s),
and constitutes the contract document.

This contract is subject to US state surplus lines requirements. It is the
responsibility of the surplus lines broker to affix a surplus lines notice to
the contract document before it is provided to the insured. In the event
that the surplus lines notice is not affixed to the contract document the
insured should contact the surplus lines broker.

Any further documentation changing this contract, agreed in accordance
with the contract change provisions set out in this contract, shall form the
evidence of such change.



OXF1115
UNIQUE MARKET
REFERENCE: B1115N184678



FILED DATE: 9/9/2020 12:12 PM   2020CH05784

# CALIFORNIA SURPLUS LINES NOTICE 1 (POST BIND)

**NOTICE:**

**1.     THE INSURANCE POLICY THAT YOU HAVE PURCHASED IS BEING ISSUED BY AN INSURER THAT IS NOT LICENSED BY THE STATE OF CALIFORNIA.  THESE COMPANIES ARE CALLED "NON-ADMITTED" OR "SURPLUS LINE" INSURERS.**

**2.     THE INSURER IS NOT SUBJECT TO THE FINANCIAL SOLVENCY REGULATION AND ENFORCEMENT THAT APPLY TO CALIFORNIA LICENSED INSURERS.**

**3.     THE INSURER DOES NOT PARTICIPATE IN ANY OF THE INSURANCE GUARANTEE FUNDS CREATED BY CALIFORNIA LAW. THEREFORE, THESE FUNDS WILL NOT PAY YOUR CLAIMS OR PROTECT YOUR ASSETS IF THE INSURER BECOMES INSOLVENT AND IS UNABLE TO MAKE PAYMENTS AS PROMISED.**

**4.     THE INSURER SHOULD BE LICENSED EITHER AS A FOREIGN INSURER IN ANOTHER STATE IN THE UNITED STATES OR AS A NON-UNITED STATES (ALIEN) INSURER. YOU SHOULD ASK QUESTIONS OF YOUR INSURANCE AGENT, BROKER, OR "SURPLUS LINE" BROKER OR CONTACT THE CALIFORNIA DEPARTMENT OF INSURANCE AT THE FOLLOWING TOLL-FREE TELEPHONE NUMBER 1-800-927-4357 OR INTERNET WEB SITE WWW.INSURANCE.CA.GOV . ASK WHETHER OR NOT THE INSURER IS LICENSED AS A FOREIGN OR NON-UNITED STATES (ALIEN) INSURER AND FOR ADDITIONAL INFORMATION ABOUT THE INSURER.  YOU MAY ALSO CONTACT THE NAIC'S INTERNET WEBSITE AT WWW.NAIC.ORG .**

**5.     FOREIGN INSURERS SHOULD BE LICENSED BY A STATE IN THE UNITED STATES AND YOU MAY CONTACT THAT STATE'S DEPARTMENT OF INSURANCE TO OBTAIN MORE INFORMATION ABOUT THAT INSURER.**



OXF1115
UNIQUE MARKET
REFERENCE: B1115N184678



FILED DATE: 9/9/2020 12:12 PM   2020CH05784

**6.  FOR NON-UNITED STATES (ALIEN) INSURERS, THE INSURER SHOULD BE LICENSED BY A COUNTRY OUTSIDE OF THE UNITED STATES AND SHOULD BE ON THE NAIC'S INTERNATIONAL INSURERS DEPARTMENT (IID) LISTING OF APPROVED NONADMITTED NON-UNITED STATES INSURERS.  ASK YOUR AGENT, BROKER, OR "SURPLUS LINE" BROKER TO OBTAIN MORE INFORMATION ABOUT THAT INSURER.**

**7.  CALIFORNIA MAINTAINS A LIST OF APPROVED SURPLUS LINE INSURERS.  ASK YOUR AGENT OR BROKER IF THE INSURER IS ON THAT LIST, OR VIEW THAT LIST AT THE INTERNET WEB SITE OF THE CALIFORNIA DEPARTMENT OF INSURANCE: WWW.INSURANCE.CA.GOV .**

**8.  IF YOU, AS THE APPLICANT, REQUIRED THAT THE INSURANCE POLICY YOU HAVE PURCHASED BE BOUND IMMEDIATELY, EITHER BECAUSE EXISTING COVERAGE WAS GOING TO LAPSE WITHIN TWO BUSINESS DAYS OR BECAUSE YOU WERE REQUIRED TO HAVE COVERAGE WITHIN TWO BUSINESS DAYS, AND YOU DID NOT RECEIVE THIS DISCLOSURE FORM AND A REQUEST FOR YOUR SIGNATURE UNTIL AFTER COVERAGE BECAME EFFECTIVE, YOU HAVE THE RIGHT TO CANCEL THIS POLICY WITHIN FIVE DAYS OF RECEIVING THIS DISCLOSURE.  IF YOU CANCEL COVERAGE, THE PREMIUM WILL BE PRO-RATED AND ANY BROKER'S FEE CHARGED FOR THIS INSURANCE WILL BE RETURNED TO YOU.**

LMA9098A
04 May 2017



OXF1115
UNIQUE MARKET
REFERENCE: B1115N184678



FILED DATE: 9/9/2020 12:12 PM   2020CH05784

## CALIFORNIA SURPLUS LINES NOTICE 2

**This insurance is issued pursuant to the California Insurance Code, Sections 1760 through 1780, and is placed in an insurer or insurers not holding a Certificate of Authority from or regulated by the California Insurance Commissioner.**

01/09/13
LMA9030



OXF1115
UNIQUE MARKET
REFERENCE: B1115N184678



FILED DATE: 9/9/2020 12:12 PM   2020CH05784

**CALIFORNIA COMPLAINTS NOTICE**

To request assistance or make an initial complaint, you should contact **Marian Lockhart** at:

**M. J. Hall and Company**

**7600 North Ingram Ave., Suite 204, Fresno, CA 93711**

In the alternative, or if you are dissatisfied with the resolution of your complaint by the above party, you may wish to contact the Lloyd's Complaints Department at:

**Lloyd's Complaints Department**
**c/o Lloyd's America Inc.**                    **Phone: 1-844-849-7828**
**25 West 53rd Street, 14th Floor**      **Fax:    1-800-481-3121**
**New York, NY 10019**                        **Email:  complaints@lloyds.com**
**USA**

The California Department of Insurance should be contacted only after discussions with the insurer, its agent, or representative, have failed to produce a satisfactory resolution.  You may contact the California Department of Insurance to obtain information on your rights or make a complaint at:

**Consumer Hotline**
**1-800-927-4357 (HELP)**

**TDD Number**
**1-800-482-4833 (TTY)**

**California Department of Insurance**
**Consumer Services Division**
**300 South Spring Street, South Tower**
**Los Angeles, CA 90013**

*LMA9136*
*08 December 2016*



OXF1115
UNIQUE MARKET
REFERENCE: B1115N184678



CA Surplus Lines Tax & Fee Breakdown

| | | |
|---|---|---|
| Premium: | $ | 30,000.00 |
| Company Fee: | $ | |
| Inspection Fee: | $ | |
| 3% State Tax: | $ | 900.00 |
| .200% Stamping Fee: | $ | 60.00 |
| Broker Fee: | $ | 500.00 |

**ACE Advantage**SM
**Private Company
Management Liability Policy**

**Declarations**

FILED DATE: 9/9/2020 12:12 PM  2020CH05784

**THIS POLICY IS A CLAIMS MADE AND REPORTED POLICY. EXCEPT AS OTHERWISE PROVIDED HEREIN, THIS POLICY COVERS ONLY CLAIMS FIRST MADE AGAINST THE INSUREDS AND REPORTED TO THE INSURER DURING THE POLICY PERIOD. THE INSURER DOES NOT ASSUME ANY DUTY TO DEFEND. PLEASE READ THIS POLICY CAREFULLY.**

**THE LIMITS OF LIABILITY AVAILABLE TO PAY INSURED LOSS SHALL BE REDUCED BY AMOUNTS INCURRED FOR DEFENSE COSTS. FURTHER NOTE THAT AMOUNTS INCURRED FOR DEFENSE COSTS AND LOSS SHALL ALSO BE APPLIED AGAINST THE RETENTION AMOUNT.**

**TERMS THAT APPEAR IN BOLD FACE TYPE HAVE SPECIAL MEANING. PLEASE REFER TO SECTION II, DEFINITIONS.**

---

**Policy** No.

Item 1. **Named Insured:**  **Birch Gold Group LP**

Principal Address:  3500 Olive Avenue
Suite 730
Burbank
California 91505

Item 2. **Policy Period**:
From: 12:01 a.m. 28th June 2018
To: 12:01 a.m. 28th June 2019
(both days Local time at the address shown in Item 1)

Item 3. Limit(s) of Liability and Retention(s):

A. Single Aggregate Limit of Liability and Retention  Granted:  ☐ Yes  _X_ No

Insuring Agreements Purchased:  Limit(s) of Liability:  Retention(s):
(including **Defense Costs**)

☐ Management Liability  $_____ each **Claim**
☐ Employment Practices Liability  } $_____Aggregate Limit  $_____ each **Claim**
☐ Fiduciary Liability  $_____ each **Claim**

B. Separate Limits of Liability and Retentions  Granted:  _X_ Yes  ☐ No

Insuring Agreements Purchased:  Limit(s) of Liability:  Retention(s):
(including **Defense Costs**)

X Management Liability  $2,000,000 Aggregate Limit  $50,000 each **Claim**
☐ Employment Practices Liability  $_____Aggregate Limit$  $_____ each **Claim**
☐ Fiduciary Liability  $_____Aggregate Limit$  $_____ each **Claim**



OXF1115
UNIQUE MARKET
REFERENCE: B1115N184678



FILED DATE: 9/9/2020 12:12 PM   2020CH05784

| | |
|---|---|
| **Item 4.** Notice to **Insurer**: | |
| Notice of **Claim** or **Wrongful Act**: | |
| | As per NMA1998 Service of Suit Clause and |
| | Jon Grimble, Oxford Insurance Brokers Ltd |
| | 6 Bevis Marks, London EC3A 7BA, UK |
| | jon.grimble@oxfordinsurancebrokers.co.uk |
| | Tel:    +44 (0) 207 220 4367 |
| | Fax:    +44 (0) 207 220 4199 |

**Item 5.** Prior or Pending Proceeding Date:
X  Management Liability                    28th June 2018
___ Employment Practices Liability          _____
___ Fiduciary Liability                     _____

**Item 6. Policy** Premium:        $30,000 annual

**Item 7. Voluntary Compliance Loss** Sublimit of Liability:$ Nil

**Item 8. Extended Reporting Period**:    12 months
Premium:        100% of the annual premium

**Item 9. Riders, Clauses and/or Endorsements:**

- Specific Entity Exclusion - Lone Wolf (dba BitIRA)
- LSW559 Retroactive Limitation Clause - Inception
- LMA5218 (amended) U.S. Terrorism Risk Insurance Act of 2002 – New & Renewal Business – included
- NMA 1998 Service of Suit Clause (U.S.A.) –Persons nominated to accept Service of Suit: As per **Item 4.** of the Declarations
- Nuclear Incident Exclusion Clause – Liability – Direct (Broad) – NMA 1256
- Radioactive Contamination Exclusion Clause – Liability – Direct – NMA 1477
- LMA3100 Sanction Limitation & Exclusion Clause
- NMA2918 War and Terrorism Exclusion Endorsement
- NMA45 Short Rate Cancellation Table
- LSW 1001 - Several Liability Notice Clause

IN WITNESS WHEREOF, the **Insurer** has caused this **Policy** to be countersigned by a duly authorized representative of the **Insurer**.

DATE: _14th August 2018_

CGM
1882/2488
XIS

_____
Authorized Representative

PF-14386 (9/03)

FILED DATE: 9/9/2020 12:12 PM    2020CH05784

OXF1115
UNIQUE MARKET
REFERENCE: B1115N184678



**ACE Advantage**<sup>SM</sup>
**Private Company**
**Management Liability Policy**

In consideration of the payment of the premium, in reliance upon the **Application**, and subject to the Declarations and the terms and conditions of this **Policy**, the **Named Insured**, the **Insureds**, and the **Insurer** agree as follows:

I.    INSURING AGREEMENTS

A.  Management Liability

If Management Liability coverage is purchased as indicated in Item 3 of the Declarations:

1.    Management Liability

The **Insurer** shall pay the **Loss** of the **Insured Persons** for which the **Insured Persons** are not indemnified by the **Company** and which the **Insured Persons** have become legally obligated to pay by reason of a **Claim** first made against the **Insured Persons** and reported to the **Insurer** during the **Policy Period** or, if elected, the **Extended Reporting Period**, for any **Wrongful Acts** taking place prior to the end of the **Policy Period**.

2.    **Company** Reimbursement

The **Insurer** shall pay the **Loss** of the **Company** for which the **Company** has indemnified the **Insured Persons** and which the **Insured Persons** have become legally obligated to pay by reason of a **Claim** first made against the **Insured Persons** and reported to the **Insurer** during the **Policy Period** or, if elected, the **Extended Reporting Period**, for any **Wrongful Acts** taking place prior to the end of the **Policy Period**.

3.    **Company** Liability

The **Insurer** shall pay the **Loss** of the **Company** which the **Company** becomes legally obligated to pay by reason of a **Claim** first made against it and reported to the **Insurer** during the **Policy Period** or, if elected, the **Extended Reporting Period**, for any **Wrongful Acts** taking place prior to the end of the **Policy Period**.

4.    **Outside Entity** Management Liability

The **Insurer** shall pay the **Loss** of any **Outside Entity Insured Person** which the **Outside Entity Insured Person** is legally obligated to pay by reason of a **Claim** first made against them and reported to the **Insurer** during the **Policy Period** or, if elected, the **Extended Reporting Period**, for any **Wrongful Acts** taking place prior to the end of the **Policy Period**, but only excess of (i) any indemnification provided by an **Outside Entity** and (ii) any insurance coverage afforded to an **Outside Entity** or its executives applicable to such **Claim**.

B.  Employment Practices Liability

If Employment Practices Liability coverage is purchased as indicated in Item 3 of the Declarations:

The **Insurer** shall pay the **Loss** of the **Insureds** which the **Insureds** have become legally obligated to pay by reason of a **Claim** first made against them and reported to the **Insurer** during the **Policy Period** or, if elected, the **Extended Reporting Period**, for any **Wrongful Acts** taking place prior to the end of the **Policy Period**, if such **Claim** is brought and maintained by or on behalf of:

1.    any past, present or prospective full-time, part-time, temporary or leased employee(s) of the **Company**; or



FILED DATE: 9/9/2020 12:12 PM   2020CH05784

OXF1115
UNIQUE MARKET
REFERENCE: B1115N184678



2. any natural person who is a customer or client, or any group of such customers or clients, other than an employee or applicant for employment with the **Company** or any **Outside Entity**.

C. Fiduciary Liability

If Fiduciary Liability coverage is purchased as indicated in Item 3 of the Declarations:

The **Insurer** shall pay the **Loss** of the **Insureds** which the **Insureds** have become legally obligated to pay by reason of a **Claim** first made against them and reported to the **Insurer** during the **Policy Period** or, if elected, the **Extended Reporting Period**, for any **Wrongful Acts** taking place prior to the end of the **Policy Period**.


II.   DEFINITIONS

When used in this **Policy**:

A.  **Administration** means (i) counseling employees, beneficiaries or **Plan** participants with respect to any **Plans**, (ii) providing interpretations with respect to any **Plan**, (iii) handing records in connection with any **Plan**, and (iv) enrolling, terminating or canceling employees under any **Plan**.

B.  **Annual Premium** means the original annualized premium and the fully annualized amount of any additional premiums charged by the **Insurer** for or during the **Policy Period**.

C.  **Application** means all applications, including any attachments thereto, and all other information and materials submitted by or on behalf of the **Insureds** to the **Insurer** in connection with the **Insurer** underwriting this **Policy** or any policy of which this **Policy** is a direct or indirect renewal or replacement. **Application** also includes any public documents filed by the **Company**, prior to inception of this **Policy**, with any federal, state, local or foreign regulatory body. All such applications, attachments, information, materials and documents are deemed attached to and incorporated into this **Policy**.

D.  **Claim** means:

1. a written demand against the **Insured** for monetary damages, or, except with respect to Insuring Agreement B, Employment Practices Liability, non-monetary or injunctive relief;

2. a civil proceeding against the **Insured** seeking monetary damages or non-monetary or injunctive relief, commenced by the service of a complaint or similar pleading;

3. a criminal proceeding against the **Insured** commenced by a return of an indictment, information, or similar document, or receipt or filing of a notice of charges;

4. an arbitration proceeding against the **Insured** seeking monetary damages or non-monetary or injunctive relief;

5. a civil, administrative or regulatory proceeding against the **Insured** commenced by the filing of a notice of charges, investigative order or similar document; or

6. a civil, administrative or regulatory investigation against the **Insured**, commenced by the service upon or other receipt by the **Insured** of a written notice or subpoena from the investigating authority identifying the **Insured** as an individual against whom a civil, administrative or regulatory investigation or proceeding may be commenced;

including any appeal therefrom. However, notwithstanding the foregoing, with respect to Insuring Agreement B, Employment Practices Liability, **Claim** shall not include a labor or grievance proceeding which is pursuant to a collective bargaining agreement.

E.  **Company** means the **Named Insured** and any **Subsidiary,** including any such organization as a debtor-in-possession or the bankruptcy estate of such entity under United States bankruptcy law or an equivalent status under the law of any other jurisdiction.

F.  **Defense Costs** means reasonable and necessary costs, charges, fees and expenses incurred by any **Insured** in defending **Claims** and the premium for appeal, attachment or



OXF1115
UNIQUE MARKET
REFERENCE: B1115N184678



similar bonds arising out of covered judgments, but with no obligation to furnish such bonds. **Defense Costs** do not include wages, salaries or fees of the directors, officers, trustees or employees of the **Company**.

G. **Domestic Partner** means any natural person qualifying as a domestic partner under the provisions of any applicable federal, state or local law or under the provisions of any formal program established by the **Company**.

H. **ERISA** means the Employee Retirement Income Security Act of 1974, as amended (including but not limited to amendments relating to the Consolidated Omnibus Budget Reconciliation Act of 1985, the Health Insurance Portability and Accountability Act of 1996, the Newborns' and Mothers' Health Protection Act of 1996, the Mental Health Parity Act of 1996, and the Women's Health and Cancer Rights Act of 1998, as amended),or any similar state or local common or statutory law, and any rules and regulations promulgated thereunder. **ERISA** also means, but solely with respect to paragraph 3b of the definition of **Wrongful Act**, Part 164 of the regulations under the Health Insurance Portability and Accountability Act of 1996, popularly known as HIPAA Privacy Regulations.

I. **Executive Officer** means the chairperson, president, chief executive officer, chief financial officer, in-house general counsel and, with respect to Insuring Agreement B, Employment Practices Liability, if purchased, the director of human resources or equivalent position.

J. **Extended Reporting Period** means the period for the extension of coverage, if elected, described in section VI, **Extended Reporting Period**.

K. **Financial Impairment** means the status of the **Company** resulting from (1) the appointment by any state or federal official, agency or court of any receiver, conservator, liquidator, trustee, rehabilitator or similar official to take control of, supervise, manage or liquidate the **Company**, or (2) the **Company** becoming a debtor in possession.

L. **Insured** means:

   1. any **Insured Person**;

   2. Except with respect to Insuring Agreement A1, Management Liability, the **Company**;

   3. Solely with respect to Insuring Agreement C, Fiduciary Liability, the **Company** and **Plans**.

M. **Insured Person** means any person who was, now is or shall become:

   1. a duly elected or appointed director, trustee (excluding a bankruptcy trustee), officer or similar executive of the **Company**, and any member of the management board of a limited liability company;

   2. a person not described in paragraph 1 of this definition who was, is or shall become a full time or part time employee of the **Company**. However, such person shall not be considered an **Insured Person** for purposes of Exclusion N3 (**Insured** vs. **Insured**) of this **Policy;** and

   3. Solely for purposes of coverage under Insuring Agreement C, Fiduciary Liability, any one or more natural person who were, now are, or shall become duly elected or appointed trustees, directors, officers or employees of any **Plan**.

N. **Insurer** means the insurance company providing this insurance.

O. **Interrelated Wrongful Acts** means all **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of related facts, circumstances, situations, events, transactions or causes.

P. **Loss** means the damages, judgments, any award of pre-judgment and post-judgment interest, settlements and **Defense Costs** which the **Insured** becomes legally obligated to pay on account of any **Claim** first made against the **Insured** during the **Policy Period** or, if elected, the **Extended Reporting Period**, for **Wrongful Acts** to which this **Policy** applies, including such damages and **Defense Costs** if incurred in connection with the U.S. Department of





FILED DATE: 9/9/2020 12:12 PM   2020CH05784

Labor's (DOL) Voluntary Fiduciary Correction Program as set forth in the Federal Register, resulting from an **Wrongful Act** occurring during the **Policy Period**, or during the policy period of any policy of which this **Policy** is a continuous renewal, provided that such compliance with such DOL Program results in the **Insured** obtaining a 'No Action' letter from the DOL.  **Loss** does not include:

1.  any amount for which the **Insured** is not financially liable or legally obligated to pay;

2.  taxes, fines or penalties.  However, solely with respect to Insuring Agreement C, fines or penalties shall not be construed to include (i) the 5% or less civil penalty imposed upon an **Insured** under Section 502(i) of **ERISA**, (ii) the 20% or less penalty imposed upon an **Insured** under Section 502(l) of **ERISA**, with respect to covered settlements or judgments, or (iii) **Voluntary Compliance Loss** to the extent set forth in Item 7 of the Declarations;

3.  punitive or exemplary damages, or the multiple portion of any multiplied damage award;

4.  any amount incurred by the **Company,** including its board of directors or any committee of the board of directors, in connection with the investigation or evaluation of any **Claim** or potential **Claim** by or on behalf of the **Company**;

5.  matters uninsurable under the laws pursuant to which this **Policy** is construed;

6.  employment related benefits, perquisites, stock options, deferred compensation or any other type of compensation other than salary, wages or bonus compensation;

7.  solely with respect to Insuring Agreement A, Management Liability:

    a.  any amount that represents or is substantially equivalent to disgorgement, restitution or rescission damages, or forfeiture of any profits or remuneration;

    b.  dividends or other distributions of **Company** profits;

    c.  the cost of any remedial, preventative or other non-monetary relief, including without limitations any costs associated with compliance with any such relief of any kind or nature imposed by any judgment, settlement or governmental authority.

Q.  **Named Insured** means the organization first named in Item 1 of the Declarations.

R.  **Outside Entity** means any not-for-profit organization under Section 501(c)(3) of the United States Internal Revenue Code of 1986, as amended, or any other entity listed by endorsement to this **Policy**.

S.  **Outside Entity Insured Person** means any duly elected or appointed director, trustee (excluding a bankruptcy trustee), officer or similar executive of a **Company**, and any member of the management board of a limited liability company, who is or was acting as a director of an **Outside Entity** at the specific written request or direction of such **Company**.

T.  **Pension Plan** means any employee pension benefit plan as defined in **ERISA**, other than:

    1.  any employee stock ownership plan as defined in **ERISA**; or

    2.  any other plan, fund, trust or program which was, is or shall be sponsored solely by the **Named Insured**, or jointly by the **Named Insured** and a labor organization, solely for the benefit of the employees and/or the directors, officers, governors, management committee members, members of the board of managers or natural person general partners of the **Named Insured**,  under which investments are made primarily in securities of the **Named Insured**, or whose assets at any time within twelve months prior to the inception date of this **Policy** were comprised of 20% or more of securities of the **Named Insured**.

U.  **Plan** means:

    1.  any **Pension Plan** or any **Welfare Plan** which was, is now, or hereafter becomes sponsored solely by the **Company**, or sponsored jointly by the **Company** and a labor



FILED DATE: 9/9/2020 12:12 PM   2020CH05784

OXF1115
UNIQUE MARKET
REFERENCE: B1115N184678

organization, solely for the benefit of the employees of the **Company**; provided any **Pension Plan** created or acquired by the **Company** during the **Policy Period** shall be included in this definition only if and to the extent coverage is afforded with respect thereto pursuant to subsection A of section XIII of this **Policy**;

2. any government-mandated insurance for workers' compensation, unemployment, social security or disability benefits for employees of the **Company**, but solely for a **Wrongful Act** as defined in subsection 3b of the definition of **Wrongful Act**; and

3. any deferred compensation plan, supplemental executive retirement plan, top-hat plan, or excess benefit plan for a select group of management or highly compensated directors, officers and/or employees.

V. **Policy** means, collectively, the Declarations, the **Application**, this policy form and any endorsements.

W. **Policy Period** means the period of time specified in Item 2 of the Declarations, subject to prior termination pursuant to section XVI, Termination of the **Policy**.

X. **Securities** means:

1. common or preferred stock or rights, warrants or options in such stock representing an ownership interest in the **Company** or a right to acquire or dispose of such interest; and

2. notes, bonds or debentures representing a debt owed by the **Company** to the extent such instruments would be deemed securities under the federal or state laws of the United States.

Y. **Subsidiary** means any entity that is not formed as a partnership or joint venture of which the **Named Insured** owns or has the right to vote more than 50% of the outstanding voting securities representing the present right to vote for election of directors, or the managers or members of the board of managers or equivalent executives of a limited liability company, on or before the inception date of the **Policy**, either directly or indirectly, in any combination, by one or more other **Subsidiaries**.

Z. **Voluntary Compliance Loss means**:

1. Fines, penalties, sanctions, voluntary correction fees, compliance fees or user fees assessed against or collected from an **Insured** by the Internal Revenue Service (IRS) pursuant to a written agreement to correct an inadvertent **Plan** defect under an Employee Plans Compliance Resolution System, provided that such agreement was entered into in writing by the **Insured** with the IRS during the **Policy Period**, or during the policy period of any policy of which this **Policy** is a continuous renewal; and

2. Penalties assessed by the U.S. Department of Labor or the IRS under a Delinquent Filer Voluntary Compliance Program for inadvertent failure to file Form 5500, provided that the failure to file such Form 5500 occurred during the **Policy Period**, or during the policy period of any policy of which this **Policy** is a continuous renewal.

AA. **Welfare Plan** means any employee welfare benefit plan as defined in **ERISA**.

BB. **Wrongful Act** means:

1. With respect to Insuring Agreement A, Management Liability: any error, misstatement, misleading statement, act, omission, neglect, or breach of duty actually or allegedly committed or attempted by:

    a. any **Insured Person** in his or her capacity as such, or any matter claimed against any **Insured Person** solely by reason of his or her serving in such capacity, with respect to Insuring Agreement A1, Management Liability, and Insuring Agreement A2, **Company** Reimbursement;





FILED DATE: 9/9/2020 12:12 PM   2020CH05784

  b. the **Company**, with respect to Insuring Agreement A3, **Company** Liability; or

  c. any **Outside Entity Insured Person** in his or her capacity as such, or any matter claimed against any **Outside Entity Insured Person** solely by reason of his or her serving in such capacity, with respect to Insuring Agreement A4, **Outside Entity** Management Liability.

2. With respect to Insuring Agreement B, Employment Practices Liability: any **Wrongful Employment Practice** actually or allegedly committed or attempted by the **Insured Persons** in their capacity as such, or by the **Company**.

3. With respect to Insuring Agreement C, Fiduciary Liability:

  a. any violation by any **Insured** of any of the responsibilities, obligations or duties imposed upon fiduciaries under **ERISA** with respect to any **Plan**, or  any matter claimed against any **Insured** solely by reason of his, her or its status as a fiduciary under **ERISA**, the **Plan** or the **Named Insured**, but only with respect to the **Plan**, or

  b. any negligent act, error or omission actually or allegedly committed or attempted by any **Insured** solely in the **Administration** of a **Plan**.

CC. **Wrongful Employment Practice** means any actual or alleged:

1. wrongful dismissal or discharge or termination of employment, whether actual or constructive,

2. employment related misrepresentation;

3. violation of any federal, state or local laws (common or statutory) concerning employment or discrimination in employment;

4. sexual harassment or unlawful workplace harassment;

5. wrongful deprivation of a career opportunity or failure to employ or promote;

6. wrongful discipline of employees;

7. retaliation against employees for the exercise of any legally protected right or for engaging in any legally protected activity;

8. negligent evaluation of employees;

9. failure to adopt adequate workplace or employment policies and procedures;

10. employment related libel, slander, defamation, or invasion of privacy;

11. employment related wrongful infliction of emotional distress;

12. solely with respect to paragraph 2 of Insuring Agreement B, Employment Practices Liability, any actual or alleged discrimination, sexual harassment, or violation of a natural person's civil rights relating to such discrimination or sexual harassment, whether direct, indirect, intentional or unintentional.

The foregoing definitions shall apply equally to the singular and plural forms of the respective words.

## III. EXCLUSIONS

The **Insurer** shall not be liable for **Loss** on account of any **Claim**:

A. Antitrust

  alleging, based upon, arising out of or attributable to any actual or alleged price fixing, restraint of trade, monopolization, unfair trade practices or other violation of the Federal Trade Commission Act, the Sherman Anti-Trust Act, the Clayton Act, or any other federal statutory provision involving anti-trust, monopoly, price fixing, price discrimination, predatory pricing or restraint of trade activities, and any amendments thereto or any rules or regulations



OXF1115
UNIQUE MARKET
REFERENCE: B1115N184678



promulgated thereunder or in connection with such statutes, or any similar provision of any federal, state, or local statutory law or common law anywhere in the world. However, this exclusion shall apply only to that part of **Loss** otherwise covered under Insuring Agreement A3, **Company** Liability.

B. Bodily Injury and Property Damage

alleging, based upon, arising out of, or attributable to bodily injury, mental anguish or emotional distress (except with respect to any **Claim** under Insuring Agreement B, Employment Practices Liability), sickness, disease or death of any person, or damage to or destruction of any tangible or intangible property including loss of use thereof, whether or not such property is physically injured.

C. Employee Benefits and Statutes

for an actual or alleged violation of the responsibilities, obligations or duties imposed by (i) any law governing workers' compensation, unemployment insurance, social security, disability or pension benefits or similar law, (ii) the Employee Retirement Income Security Act of 1974; (ii) the Fair Labor Standards Act (except the Equal Pay Act); (iii) the National Labor Relations Act or Labor Management Relations Act; (iv) the Worker Adjustment and Retraining Notification Act; (v) the Consolidated Omnibus Budget Reconciliation Act of 1985 (vi) the Occupational Safety and Health Act, or (vi) any similar state or local laws, and any rules and regulations promulgated thereunder and amendments thereto. However, this exclusion shall not apply to that part of any **Claim** under Insuring Agreement C, Fiduciary Liability; and shall not apply to that part of any **Claim** under Insuring Agreement B, Employment Practices Liability, where such **Claim** is for any actual or alleged retaliatory treatment of the claimant by the **Insured** on account of the claimant's exercise of rights pursuant to any such law, rule or regulation.

D. Fraud

alleging, based upon, arising out of, or attributable to any fraudulent or criminal act, error or omission, or any intentional or knowing violation of the law; however, this exclusion shall not apply shall not apply unless and until there is a final judgment against any **Insured** as to such conduct. When there is a final judgment, the **Insured** shall reimburse the **Insurer** for any **Defense Costs** advanced.

E. Personal Injury

alleging, based upon, arising out of, or attributable to injury from false arrest, detention, or imprisonment; wrongful eviction from, wrongful entry into or invasion of right of private occupancy of a dwelling; libel, slander, defamation or disparagement; violation of a right of privacy of a person. However, this exclusion shall not apply to that part of any **Claim** under Insuring Agreement B, Employment Practices Liability.

F. Personal Profit and Insider Trading

alleging, based upon, arising out of, or attributable to:

1. the gaining in fact of any profit, remuneration or financial advantage to which any **Insured Person** was not legally entitled; or

2. an accounting of profits in fact made from the purchase and sale or sale and purchase by any **Insured Person** of securities of the **Company** within the meaning of Section 16(b) of the Securities Exchange Act of 1934, as amended, or similar provisions of any state statutory law, regulation or common law.

G. Pollution

alleging, based upon, arising out of, or attributable to:

1. the actual, alleged or threatened discharge, dispersal, release, escape, seepage, migration or disposal of **Pollutants**; or



FILED DATE: 9/9/2020 12:12 PM   2020CH05784

OXF1115
UNIQUE MARKET
REFERENCE: B1115N184678



2. any direction or request that any **Insured** or **Outside Entity** test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**, or any voluntary decision to do so;

including without limitation any **Claim** by or on behalf of the **Company** or **Outside Entity**, its securities holders or creditors based upon, arising out of, or attributable to the matters described in this exclusion.

However, this exclusion shall not apply to:

1. that part of any **Claim** under Insuring Agreement B, Employment Practices Liability where such **Claim** is for any actual or alleged retaliatory treatment of the claimant by the **Insured** on account of the claimant's actual or threatened disclosure of the matters described in 1 or 2 above of this exclusion; or

2. any **Securities Claim** against **Insured Persons** for which the **Company** does not indemnify the **Insured Persons** either because the **Company** is neither permitted nor required to grant such indemnification or because of the **Financial Impairment** of the **Company**.

For purposes of this exclusion, **Pollutants** mean any substance exhibiting any hazardous characteristics as defined by, or identified on a list of hazardous substances issued by the United States Environmental Protection Agency or any federal, state, county, municipal or local counterpart thereof or any foreign equivalent. Such substances shall include, without limitation, solids, liquids, gaseous or thermal irritants, contaminants or smoke, vapor, soot, fumes, acids, alkalis, chemicals or waste materials. **Pollutants** shall also mean any other air emission, odor, waste water, oil or oil products, infectious or medical waste, asbestos or asbestos products, noise, fungus (including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi, but does not include any fungi intended by the **Insured** for consumption) and electric or magnetic or electromagnetic field.

H. Prior Notice

alleging, based upon, arising out of, or attributable to:

1. any **Wrongful Act**, fact, circumstance or situation which has been the subject of any written notice given under any other policy of which this **Policy** is a renewal or replacement or which it succeeds in time; or

2. any other **Wrongful Act** whenever occurring which, together with a **Wrongful Act** which has been the subject of such notice, would constitute **Interrelated Wrongful Acts**.

I. Prior or Pending Proceeding

alleging, based upon, arising out of, or attributable to:

1. any prior or pending litigation or administrative or regulatory proceeding filed on or before the prior or pending proceeding date shown in Item 5 of the Declarations, or the same or substantially the same **Wrongful Act**, fact, circumstance or situation underlying or alleged therein; or

2. any other **Wrongful Act** whenever occurring which, together with a **Wrongful Act** underlying or alleged in such prior or pending proceeding, would constitute **Interrelated Wrongful Acts**.

J. Public Offering or Ownership

alleging, based upon, arising out of, or attributable to:

1. any actual or attempted public offering, solicitation, sale, distribution or issuance of **Securities** by or on behalf of the **Company**, including all activities in connection therewith; and



OXF1115
UNIQUE MARKET
REFERENCE: B1115N184678



FILED DATE: 9/9/2020 12:12 PM   2020CH05784

2.   any **Wrongful Act** actually or allegedly committed subsequent to any such actual or attempted public offering, solicitation, sale, distribution or issuance of **Securities** by or on behalf of the **Company**.

K.   **Securities**

alleging, based upon, arising out of, or attributable to:

1.   the Securities Act of 1933, the Securities Exchange Act of 1934, any rules or regulations of the Securities Exchange Commission adopted thereunder, any federal, state or provincial statute or common law regulating securities similar to the foregoing, including any amendments thereto, any rules or regulations adopted pursuant thereto, or any other federal, state or provincial law or common law relating to liability in connection with the offering, sale or purchase of **Securities** of a **Company**, except as provided in subsection 2 immediately below;

2.   any offering, solicitation, sale, distribution or issuance ("Offering") of **Securities** in excess of $5 million which is exempt from the registration requirements of the Securities and Exchange Commission pursuant to Section 3(b) of the Securities Act of 1933 and rules and regulations promulgated thereunder. However, this exclusion shall not apply if, prior to such Offering, the **Insurer** agrees in writing to extend coverage for **Wrongful Acts** in connection with such **Offering**, and the **Insureds** have paid the premium required by the **Insurer** for such coverage extension; or

3.   any activities or transactions dealing in any way with the **Company's** Offering.

L.   **Subsidiary Wrongful Acts**

alleging, based upon, arising out of, or attributable to any **Wrongful Act** actually or allegedly committed or attempted by a **Subsidiary** or **Insured Persons** thereof:

1.   before the date the **Subsidiary** became an **Insured**;

2.   after the date the **Subsidiary** ceased to be an **Insured**.

M.   Wages

alleging, based upon, arising out of, or attributable to any claims for unpaid wages or overtime pay for hours actually worked or labor actually performed by any employee of a **Company**, for improper payroll deductions or any violation of any federal state, local or foreign statutory law or common law that governs the same topic or subject, and any rules, regulations and amendments thereto.

N.   The following exclusions shall apply to any **Claim** covered, in whole or in part, under Insuring Agreement A, Management Liability:

1.   Contract or Agreement

alleging, based upon, arising out of, or attributable to the actual or alleged breach of any oral, written, express or implied contract or agreement. However, this exclusion shall not apply to the extent that liability would have attached to the **Company** in the absence of such contract or agreement, or where such **Claim** is covered entirely under Insuring Agreement A1, Management Liability, and A2, **Company** Reimbursement, and no part of such **Claim** is covered under Insuring Agreement A3, **Company** Liability.

2.   Customer or Client

brought or maintained by or on behalf of or in the right of a customer or client of the **Company** in connection with the actual or alleged rendering or failure to render any service to or for the benefit of such customer or client. However, this exclusion shall not apply to:

a.   that part of **Loss** otherwise covered under Insuring Agreement A1, Management Liability, and A2, **Company** Reimbursement; or





FILED DATE: 9/9/2020 12:12 PM   2020CH05784

b. any **Claim** covered in whole or in part under Insuring Agreement B, Employment Practices Liability.

3. **Insured** vs. **Insured**

brought or maintained by, on behalf of, or in the right of any **Insured Person**, the **Company**, or any bankruptcy or insolvency trustee, receiver, examiner, liquidator or similar official for the **Company**, in any respect and whether or not collusive, or which is brought by any securities holder or member of the **Company,** whether directly or derivatively, unless the **Claim** of such securities holder or member is instigated and continued totally independent of, and totally without the solicitation, assistance, active participation, or intervention of, any **Insured Person** or the **Company**; provided, however, this exclusion shall not apply:

a. to any **Claim** brought or maintained by any **Insured Person** in the form of a cross-claim or a third-party claim for contribution or indemnity which is part of, and results directly from, a **Claim** that is covered by this **Policy**;

b. to an employment-related **Claim** brought by an **Insured Person**, other than an **Insured Person** who is or was a member of the Board of Directors (or equivalent governing body) of the **Company**; or

c. any **Claim** brought by any past **Insured Person** of the **Company** who has not provided service as a duly elected or appointed director, officer, trustee, governor, management committee member, member of the management board, General Counsel, Risk Manager (or equivalent position) of or consultant for the **Company** for at least four years prior to such **Claim** being first made against any person.

4. Intellectual Property and **Company** Goods and Products

alleging, based upon, arising out of, or attributable to (i) any actual or alleged infringement, misappropriation, or violation of copyright, patent, service marks, trademarks, trade secrets, title or other proprietary or licensing rights or intellectual property of any products, technologies or services, or (ii) any goods or products manufactured, produced, processed, packaged, sold, marketed, distributed, advertised or developed by the **Company**.  However, this exclusion shall apply only to that part of **Loss** otherwise covered under Insuring Agreement A3, **Company** Liability.

5. Outside Directorship Liability

for a **Wrongful Act** actually or allegedly committed or attempted by any **Insured Person** in his or her capacity as a director, officer, trustee, manager, member of the board of managers or equivalent executive of a limited liability company or employee of, or independent contractor for or in any other capacity or position with any organization other than an **Outside Entity** or the **Company**, even if service in such capacity or position is with the knowledge and consent of, at the direction or request of, or part of the duties regularly assigned to the **Insured Person** by the **Company**.

6. **Outside Entity** Claims

brought or maintained by, on behalf of, or in the right of any **Outside Entity**, or any past, present or future duly elected or appointed director, officer, trustee, governor, or management committee member of any **Outside Entity**, or any bankruptcy or insolvency trustee, receiver, examiner, liquidator or similar official for the **Outside Entity**, in any respect and whether or not collusive, or which is brought by any securities holder or member of the **Outside Entity**, whether directly or derivatively, unless the claim of such securities holder or member is instigated and continued totally independent of, and totally without the solicitation, assistance, active participation, or intervention of, any **Outside Entity** or such person.

7. **Outside Entity** Prior Act

with respect to any **Outside Entity Insured Person**, for any **Wrongful Act** occurring prior to the effective date of this **Policy** or any **Policy** issued by the **Insurer**, or any



OXF1115
UNIQUE MARKET
REFERENCE: B1115N184678



affiliate thereof, of which this is a direct or indirect renewal or replacement, if any **Insured**, as of such date, knew or could have reasonably foreseen that such **Wrongful Act** could lead to a **Claim** under this **Policy**.

8. **Wrongful Employment Practice**

alleging, based upon, arising out of, or attributable to a **Wrongful Employment Practice**.

O. The following exclusions shall apply only to any **Claim** covered in whole or in part under Insuring Agreement B, Employment Practices Liability:

1. Contract or Obligation

damages determined to be owing under an express written contract with or express written severance obligation of the **Company**; but this exclusion shall not apply if and to the extent that liability would have attached to the **Insureds** in the absence of the written contract with or obligation of the **Company**. However, this exclusion shall not apply to **Defense Costs**.

2. Compensation Earned or Due

compensation earned by or due to the claimant in the course of employment but not paid by the **Company**, including any unpaid salary, bonus, hourly pay, overtime pay, severance pay, retirement benefits, vacation days or sick days. However, this exclusion shall not apply to any (i) back pay or front pay allegedly due as the result of discrimination, and (ii) **Defense Costs**.

3. Medical or Insurance Benefits

medical or insurance benefits to which the claimant allegedly was entitled or would have been entitled had the **Company** provided the claimant with a continuation or conversion of insurance. However, this exclusion shall not apply to **Defense Costs**.

4. Remedial, Preventative and Non-Monetary Relief

the cost of any remedial, preventive or other non-monetary relief including without limitation (i) any costs associated with compliance with any such relief of any kind or nature imposed by any judgment, settlement, or governmental authority, or (ii) any costs associated with providing any reasonable accommodations required by, made as a result of, or to conform with the requirements of, the Americans with Disabilities Act and any amendments thereto or any similar federal, state or local statute, regulation, or common laws.

P. The following exclusions shall apply only to any **Claim** covered in whole or in part under Insuring Agreement C, Fiduciary Liability:

1. Benefits Due

benefits due or to become due under any **Plan**, benefits which would be due under any **Plan** if such **Plan** complied with all applicable law, or that portion of any settlement or judgment which constitutes such benefits. However, this exclusion shall not apply to **Defense Costs** or to the extent that recovery for such benefits is based upon a covered **Wrongful Act** by an **Insured Person** and such benefits are payable as a personal obligation of such **Insured Person**.

2. Contract or Agreement

alleging, based upon, arising out of, or attributable to the actual or alleged breach of any oral, written, express or implied contract or agreement. However, this exclusion shall not apply to (i) **Defense Costs**, and (ii) to the extent that liability would have attached to the **Company** in the absence of such contract or agreement, or where the liability was assumed in accordance with or under the trust agreement or equivalent document pursuant to which the **Plan** was established.

3. Contributions Owed



FILED DATE: 9/9/2020 12:12 PM   2020CH05784

alleging, based upon, arising out of, or attributable to the failure to collect from the **Company** contributions it owed to any **Plan**, or the failure to fund a **Plan** in accordance with **ERISA**, any similar state or local law, or the **Plan** instrument. However, this exclusion shall not apply to **Defense Costs**.

4.   Discrimination

for discrimination in violation of any law other than (i) any law governing workers' compensation, unemployment insurance, social security, disability or pension benefits or similar law, (ii) the Employee Retirement Income Security Act of 1974; (ii) the Fair Labor Standards Act (except the Equal Pay Act); (iii) the National Labor Relations Act or Labor Management Relations Act; (iv) the Worker Adjustment and Retraining Notification Act; (v) the Occupational Safety and Health Act, or (vi) any similar state or local laws, and any rules and regulations promulgated thereunder and amendments thereto.

5.   Government Mandated Insurance

alleging, based upon, arising out of, or attributable to any actual or alleged obligation of any **Insured** pursuant to any government-mandated insurance for worker's compensation, unemployment, social security or disability benefits.  However, this exclusion shall not apply to any actual or alleged obligation of any **Insured** pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended.

## IV.   SEVERABILITY OF EXCLUSIONS

For the purpose of determining the applicability of exclusions D, Fraud, and F, Personal Profit and Insider Trading, of section III, Exclusions, the **Wrongful Act** of any **Insured Person** shall not be imputed to any other **Insured Person** who had no knowledge of and did not participate in the conduct, and only the **Wrongful Act** of any **Executive Officer** of the **Company** shall be imputed to the **Company**.

## V.   ESTATES, LEGAL REPRESENTATIVES, AND SPOUSES

The estates, heirs, legal representatives, assigns, spouses and **Domestic Partners** of **Insured Persons** shall be considered **Insureds** under this **Policy**; but coverage is afforded to such estates, heirs, legal representatives, assigns, spouses and **Domestic Partners** only for a **Claim** arising solely out of their status as such and, in the case of a spouse or **Domestic Partner**, where the **Claim** seeks damages from marital community property, jointly held property or property transferred from the **Insured Person** to the spouse or **Domestic Partner**.  No coverage is provided for any **Wrongful Act** of an estate, heir, legal representative, assign, spouse or **Domestic Partner**. All of the terms and conditions of this **Policy** including, without limitation, the Retention applicable to **Loss** incurred by **Insured Persons** shown in Item 3 of the Declarations, shall also apply to **Loss** incurred by such estates, heirs, legal representatives, assigns, spouses and **Domestic Partners**.

## VI.   EXTENDED REPORTING PERIOD

A.   If the **Insurer** or **Named Insured** terminates or does not renew this **Policy** (other than for failure to pay a premium when due), the **Named Insured** shall have the right, upon payment of the additional premium described below, to a continuation of the coverage granted by this **Policy** for the **Extended Reporting Period** of one year following the effective date of such termination or nonrenewal, but only with respect to **Claims** first made during the **Extended Reporting Period** and arising from **Wrongful Acts** taking place prior to the effective date of such termination or nonrenewal.  This right to continue coverage shall lapse unless written notice of such election is given by the **Named Insured** to the **Insurer** within 30 days following the effective date of termination or nonrenewal.  A change in policy terms, conditions, exclusions and/or premiums shall not be considered a nonrenewal for purposes of triggering the rights to the **Extended Reporting Period.**





FILED DATE: 9/9/2020 12:12 PM   2020CH05784

B.  The **Insurer** shall give the **Named Insured** notice of the premium due for the **Extended Reporting Period** as soon as practicable following the date the **Named Insured** gives such notice of such election and such premium shall be paid by the **Named Insured** to the **Insurer** within 10 days following the date of such notice by the **Insurer** of the premium due. The **Extended Reporting Period** is not cancelable and the entire premium for the **Extended Reporting Period** shall be deemed fully earned and non-refundable upon payment.

C.  The Limit of Liability applicable to the **Extended Reporting Period**, if elected, shall be part of and not in addition to the Limit of Liability shown in Item 3, and the Sublimit of Liability shown in Item 7, of the Declarations for the immediately preceding **Policy Period**. The purchase of the **Extended Reporting Period** shall not increase or reinstate the Limit of Liability or the Sublimit of Liability, which shall be the maximum liability of the **Insurer** for the **Policy Period** and **Extended Reporting Period**, combined.

## VII. LIMITS OF LIABILITY

A.  All **Claims** arising out of the same **Wrongful Act** and all **Interrelated Wrongful Acts** of the **Insureds** shall be deemed to be one **Claim**, and such **Claim** shall be deemed to be first made on the date the earliest of such **Claims** is first made, regardless of whether such date is before or during the **Policy Period**. All **Loss** resulting from a single **Claim** shall be deemed a single **Loss**.

B.  If a single aggregate Limit of Liability is granted as provided in Item 3A of the Declarations, the amount stated in Item 3A of the Declarations shall be the maximum aggregate liability of the **Insurer** for each **Policy Period**, regardless of the number of **Claims** or losses, the coverage(s) purchased, or the time of payment by the **Insurer**. The **Voluntary Compliance Loss** Sublimit of Liability set forth in Item 7 of the Declarations is the maximum aggregate limit of the **Insurer's** liability for each **Policy Period** and, if elected, **Extended Reporting Period**, for all **Voluntary Compliance Loss**. The **Voluntary Compliance Loss** Sublimit of Liability is part of, and not in addition to, the Limit of Liability set forth in Item 3A of the Declarations and in no way shall be deemed to increase the Limit of Liability as set forth therein.

C.  If separate Limits of Liability are granted as provided in Item 3B of the Declarations:

1.  The maximum aggregate liability of the **Insurer** for all **Loss** under each Insuring Agreement resulting from all **Claims** first made during the **Policy Period** and, if elected, the **Extended Reporting Period**, shall be the respective Limit of Liability for such Insuring Agreement as set forth in Item 3B, regardless of the number of **Claims** or **Losses** or the time of payment by the **Insurer**. The **Voluntary Compliance Loss** Sublimit of Liability set forth in Item 7 of the Declarations is the maximum aggregate limit of the Insurer's liability for each **Policy Period** and, if elected, the for all **Voluntary Compliance Loss**. The **Voluntary Compliance Loss** Sublimit of Liability is part of, and not in addition to, the respective Limit of Liability set forth in Item 3B of the Declarations and in no way shall be deemed to increase the respective Limit of Liability as set forth therein.

2.  If more than one Insuring Agreement applies to a **Claim**, the maximum aggregate liability of the **Insurer** under all such Insuring Agreements, combined, with respect to such **Claim** shall be the largest of such applicable Limits of Liability.

3.  The Limit of Liability for each Insuring Agreement described in paragraphs 1 and 2 above are sublimits applicable only to each such Insuring Agreement and cannot be applied to and do not increase the **Insurer's** maximum liability under any other Insuring Agreement.

D.  **Defense Costs** shall be part of and not in addition to the applicable Limit(s) of Liability shown in Item 3 and Sublimit of Liability shown in Item 7 of the Declarations, and **Defense Costs** shall reduce such Limit(s) of Liability. If the Limit(s) of Liability are exhausted by payment of **Loss**, the obligations of the **Insurer** under this **Policy** shall be completely fulfilled and extinguished.



FILED DATE: 9/9/2020 12:12 PM   2020CH05784

OXF1115
UNIQUE MARKET
REFERENCE: B1115N184678



## VIII. RETENTIONS

A. Except as otherwise provided in this section, the liability of the **Insurer** shall apply only to that part of **Loss** which is excess of the applicable Retention amount shown in Item 3 of the Declarations. Such Retention shall be borne uninsured by the **Insureds** and at their own risk. If different parts of a single **Claim** are subject to different applicable Retentions, the applicable Retentions will be applied separately to each part of such **Loss**, but the sum of such Retentions shall not exceed the largest applicable Retention.

B. A single Retention amount shall apply to **Loss** arising from all **Claims** alleging **Interrelated Wrongful Acts**.

C. No Retention shall apply to any **Loss** incurred by any **Insured Person** except when and to the extent that the **Company** has indemnified the **Insured Person**.

## IX. NOTICE

A. The **Insureds** shall, as a condition precedent to their rights under this **Policy**, give to the **Insurer** written notice of any **Claim** made against the **Insureds** as soon as practicable, but in no event later than the termination of the **Policy Period** or, if elected, the **Extended Reporting Period**.

B. If during the **Policy Period** the **Insureds** first become aware of facts or circumstances which may reasonably give rise to a future **Claim** covered under this **Policy,** give written notice to the **Insurer** during the **Policy Period** of:

1. the identity of the potential claimants;

2. a description of the anticipated **Wrongful Act** allegations;

3. the identity of the **Insureds** allegedly involved;

4. the circumstances by which the **Insureds** first became aware of the facts or circumstances;

5. the consequences which have resulted or may result; and

6. the nature of the potential monetary damages and non-monetary relief;

then any **Claim** which arises out of such **Wrongful Act** shall be deemed to have been first made at the time such written notice was received by the **Insurer**. No coverage is provided for fees, expenses and other costs incurred prior to the time such **Wrongful Act** results in a **Claim**.

C. All notices under any provision of this **Policy** shall be in writing and given by prepaid express courier, certified mail or facsimile transmission properly addressed to the appropriate party. Notice to the **Insureds** may be given to the **Named Insured** at the address shown in Item 1 of the Declarations. Notice to the **Insurer** of any **Claim** or **Wrongful Act** shall be given to the **Insurer** at the address shown in Item 4A of the Declarations. All other notices to the **Insurer** under this **Policy** shall be given to the **Insurer** at the address shown in Item 4B of the Declarations. Notice given as described above shall be deemed to be received and effective upon actual receipt thereof by the addressee or one day following the date such notice is sent, whichever is earlier.

D. No notice that may be given during the **Policy Period** under section IX, Notice, at subsection B may be given during the **Extended Reporting Period**, if elected.

## X. DEFENSE AND SETTLEMENT

A. It shall be the duty of the **Insureds** and not the duty of the **Insurer** to defend any **Claim.**

B. The **Insureds** agree not to settle or offer to settle any **Claim**, incur any **Defense Costs** or otherwise assume any contractual obligation or admit any liability with respect to any **Claim**





FILED DATE: 9/9/2020 12:12 PM   2020CH05784

without the prior written consent of the **Insurer**. The **Insurer** shall not be liable for any settlement, **Defense Costs**, assumed obligation or admission to which it has not consented. The **Insureds** shall promptly send to the **Insurer** all settlement demands or offers received by any **Insured** from the claimant(s). However, if the **Insureds** are able to settle all **Claims** which are subject to a single Retention for an aggregate amount, including **Defense Costs**, not exceeding such Retention, the consent of the **Insurer** shall not be required for the settlement of such **Claims**.

C.  The **Insurer** shall have the right and shall be given the opportunity to effectively associate with the **Insureds** regarding the defense and negotiation of any settlement of any **Claim**.

D.  The **Insureds** agree to provide the **Insurer** with all information, assistance and cooperation which the **Insurer** reasonably requests and agree that, in the event of a **Claim**, the **Insureds** will do nothing that shall prejudice the position of the **Insurer** or its potential or actual rights of recovery. The **Insurer** may make any investigation it deems necessary.

E.  If the **Insurer** recommends a settlement within the **Policy** Limit of Liability which is acceptable to the claimant, but the **Insureds** do not consent to such settlement within 30 days of the date the **Insureds** are first made aware of the potential settlement, the **Insurer's** liability for all **Loss** on account of such **Claim** shall not exceed (i) the amount for which the **Insurer** could have settled such **Claim** plus **Defense Costs** incurred as of the date the potential settlement was proposed in writing by the **Insurer** to the **Insureds**, and (ii) 50% of all subsequent covered **Loss** in excess of such amount, the remaining 50% of which shall be borne by the **Insureds** uninsured and at their own risk. However, this subsection does not apply to any potential settlement that is within the Retention.

F.  The **Insurer** shall, on a quarterly basis, advance on behalf of the **Insureds** covered **Defense Costs** which the **Insureds** have incurred in connection with **Claims** made against them, prior to disposition of such **Claims**. Any advancement of **Defense Costs** shall be subject to the condition that such advanced amounts shall be repaid to the **Insurer** by the **Insureds** severally according to their respective interests if and to the extent the **Insureds** shall not be entitled to coverage for such **Defense Costs** under the terms and conditions of this **Policy**.

## XI.  PRESUMPTIVE INDEMNIFICATION

The **Company** agrees to indemnify the **Insured Persons** to the fullest extent permitted by law, taking all steps necessary or advisable in furtherance thereof, including the making in good faith of any application for court approval, the passing of any resolution by the board of directors or shareholders of the **Company**, the amendment of any charter, bylaws, operating agreement or similar documents of the **Company** or the execution of any contract. The **Company** further agrees to advance **Defense Costs** actually and reasonably incurred by any **Insured Person** in defending any threatened, pending or contemplated action, suit or proceeding prior to a final disposition of any such action, suit or proceeding and shall not require any determination or adjudication, interim or final, of the entitlement of the **Insured Person** to indemnification, where permitted by law to do so. The financial ability of any **Insured Person** to make repayment shall not be a prerequisite to the making of such an advance, and the right to receive advancement of **Defense Costs** herein is a contractual right. The agreements contained in this paragraph are binding upon the **Company** and enforceable by the **Insurer** or the **Insured Persons**.

## XII.  OTHER INSURANCE

If any **Loss** covered under this **Policy** is covered under any other valid insurance, then this **Policy** shall cover the **Loss**, subject to its terms and conditions, only to the extent that the amount of the **Loss** is in excess of the amount of such other insurance whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written only as specific excess insurance over the Limit of Liability provided by this **Policy**.



FILED DATE: 9/9/2020 12:12 PM   2020CH05784

OXF1115
UNIQUE MARKET
REFERENCE: B1115N184678



XIII. MATERIAL CHANGES IN CONDITIONS

A.   Acquisition or Creation of Another Organization or **Plan**

For purposes of this subsection A:

(i)   Publicly-held organization means any company with securities registered with the Securities and Exchange Commission pursuant to the Securities Act of 1933.

(ii)   Privately-held organization means any company which does not have securities registered with the Securities and Exchange Commission pursuant to the Securities Act of 1933, amendments thereto, and rules and regulations promulgated thereunder.

(iii)   Not-for-profit organization means any company which qualifies as a not-for-profit organization under Section 501(c)(3) of the United States Internal Revenue Code of 1986, as amended.

Privately-Held or Not-for-Profit Organization

If, during the **Policy Period**, the **Company**:

1.   acquires voting securities in another organization or creates another organization which is a privately-held organization or a not-for-profit organization, which as a result of such acquisition or creation becomes a **Subsidiary**;

2.   acquires any privately-held organization or a not-for-profit organization by merger into or consolidation with the **Company**; or

3.   with respect to the Insuring Agreement C, Fiduciary Liability, if purchased, creates a **Plan**,

then, subject to the terms and conditions of this **Policy** including the paragraph immediately below, such organization, **Plan** and its **Insured Persons** shall be covered under this **Policy** but only with respect to **Claims** for **Wrongful Acts** taking place after such acquisition or creation, unless the **Insurer** agrees to provide coverage by endorsement for **Wrongful Acts** taking place prior to such acquisition, creation or change in qualification.

If the total assets of such acquired organization or **Plan**, as reflected in the then most recent consolidated financial statements of the organization, or most recent financial statements of the **Plan**, exceeds 10% of the total assets of the **Named Insured** and the **Subsidiaries** as reflected in the then most recent consolidated financial statements of the **Named Insured**, or 10% of the total assets of the **Plan** as reflected in its most recent financial statements, the **Named Insured**, as a condition precedent to coverage with respect to such **Insureds**, shall, prior to such acquisition:

a.   give written notice of such acquisition or creation to the **Insurer**;

b.   pay any additional premium required by the **Insurer**; and

c.   agree to any additional terms and conditions of this **Policy** as required by the **Insurer**.

Publicly-Held Organization

If, during the **Policy Period**, the **Company**:

1.   acquires voting securities in another organization or creates another organization which is a publicly-held organization, which as a result of such acquisition or creation becomes a **Subsidiary**; or

2.   acquires any publicly-held organization by merger into or consolidation with the **Company**;

the **Named Insured**, as a condition precedent to coverage for such organization, **Plan** and its **Insured Persons**, shall, prior to such acquisition:

a.   give written notice of such acquisition or creation to the **Insurer**;

b.   pay any additional premium required by the **Insurer**; and





FILED DATE: 9/9/2020 12:12 PM   2020CH05784

c. agree to any additional terms and conditions of this **Policy** as required by the **Insurer**.

B. Acquisition of the **Named Insured**

If, during the **Policy Period**, any of the following events occurs:

1. the acquisition of the **Named Insured**, or of all or substantially all of its assets, by another entity, or the merger or consolidation of the **Named Insured** into or with another entity such that the **Named Insured** is not the surviving entity; or

2. the obtaining by any person, entity or affiliated group of persons or entities of the right to elect, appoint or designate at least 50% of the directors of the **Named Insured**;

then coverage under this **Policy** will continue in full force and effect until termination of this **Policy**, but only with respect to **Claims** for **Wrongful Acts** taking place before such event. Coverage under this **Policy** will cease as of the effective date of such event with respect to **Claims** for **Wrongful Acts** taking place after such event.

C. Termination of a **Subsidiary**

If before or during the **Policy Period** an organization ceases to be a **Subsidiary**, coverage with respect to the **Subsidiary** and its **Insured Persons** shall continue until termination of this **Policy**. Such coverage continuation shall apply only with respect to **Claims** for **Wrongful Acts** taking place prior to the date such organization ceased to be a **Subsidiary**.

D. Termination of a **Plan**

If before or during the **Policy Period** a **Plan** is terminated, sold or run-off, coverage with respect to such **Plan** under Insuring Agreement C, Fiduciary Liability, if purchased, shall continue until termination of this **Policy**. Such coverage continuation shall apply only with respect to **Claims** for **Wrongful Acts** taking place prior to the date such **Plan** was terminated, sold or run-off.

E. Other Organizational Changes

Coverage with respect to an **Insured** or **Plan** under Insuring Agreement C, Fiduciary Liability, if purchased, is afforded only for **Wrongful Acts** committed or allegedly committed after the effective time such **Insured** or **Plan** became an **Insured** and prior to the effective time that such **Insured** or **Plan** ceases to be an **Insured** or **Plan**.

## XIV. PAYMENT PRIORITY

A. If the amount of any **Loss** which is otherwise due and owing by the **Insurer** exceeds the then-remaining Limit of Liability applicable to the **Loss**, the **Insurer** shall pay the **Loss** (subject to such Limit of Liability) in the following priority:

1. first, the **Insurer** shall pay any **Loss** covered under Insuring Agreement A1, Management Liability, in excess of any applicable Retention shown in Item 3 of the Declarations;

2. second, only if and to the extent the payment under paragraph 1 above does not exhaust the applicable Limit of Liability, the **Insurer** shall pay any **Loss** in excess of the Retention shown in Item 3 of the Declarations covered under any other applicable Insuring Agreement.

B. Subject to the foregoing paragraph, the **Insurer** shall, upon receipt of a written request from the Chief Executive Officer of the **Named Insured**, delay any payment of **Loss** otherwise due and owing to or on behalf of the **Company** until such time as the Chief Executive Officer of the **Named Insured** designates, provided the liability of the **Insurer** with respect to any such delayed **Loss** payment shall not be increased, and shall not include any interest, on account of such delay.



FILED DATE: 9/9/2020 12:12 PM   2020CH05784

OXF1115
UNIQUE MARKET
REFERENCE: B1115N184678



## XV.  REPRESENTATIONS

A.  The **Insureds** represent and acknowledge that the statements and information contained in the **Application** are true and accurate and:

1.  are the basis of this **Policy** and are to be considered as incorporated into and constituting a part of this **Policy**; and

2.  shall be deemed material to the acceptance of this risk or the hazard assumed by the **Insurer** under this **Policy**.

It is understood and agreed that this **Policy** is issued in reliance upon the truth and accuracy of such representations.

B.  In the event the **Application**, including materials submitted or required to be submitted therewith, contains any misrepresentation or omission made with the intent to deceive or which materially affects either the acceptance of the risk or the hazard assumed by the **Insurer** under this **Policy**, this **Policy** shall be void ab initio as to (i) any **Company** or **Plan** if any **Executive Officer** knew the facts that were not truthfully disclosed or that were omitted in the Application, and (ii) any **Insured Person** who knew the facts that were not truthfully disclosed or that were omitted, whether or not such **Insured Person** knew the **Application** contained such misrepresentation or omission.  Except with respect to the **Company's** Chief Executive Officer and Chief Financial Officer, such knowledge shall not be imputed to any other **Insured Persons**.

## XVI. TERMINATION OF THE **POLICY**

A.  This **Policy** shall terminate at the earliest of the following times:

1.  the effective date of termination specified in a prior written notice by the **Named Insured** to the **Insurer**;

2.  30 days after receipt by the **Named Insured** of a written notice of termination from the **Insurer**;

3.  10 days after receipt by the **Named Insured** of a written notice of termination from the **Insurer** for failure to pay a premium when due, unless the premium is paid within such 10 day period;

4.  upon expiration of the **Policy Period** as shown in Item 2 of the Declarations; or

5.  at such other time as may be agreed upon by the **Insurer** and the **Named Insured**.

B.  If this **Policy** is terminated by the **Named Insured**, the **Insurer** shall refund the unearned premium computed at the customary short rate.  If this **Policy** is terminated by the **Insurer**, the **Insurer** shall refund the unearned premium computed *pro rata*.  Payment or tender of any unearned premium by the **Insurer** shall not be a condition precedent to the effectiveness of such termination, but such payment shall be made as soon as practicable.

## XVII. TERRITORY AND VALUATION

A.  All premiums, limits, retentions, **Loss** and other amounts under this **Policy** are expressed and payable in the currency of the United States of America.  If judgment is rendered, settlement is denominated or another element of **Loss** under this **Policy** is stated in a currency other than United States of America dollars, payment under this **Policy** shall be made in United States dollars at the applicable rate of exchange as published in *The Wall Street Journal* as of the date the final judgment is reached, the amount of the settlement is agreed upon or the other element of **Loss** is due, respectively or, if not published on such date, the next date of publication of *The Wall Street Journal*.

B.  Coverage under this **Policy** shall extend to **Wrongful Acts** taking place or **Claims** made anywhere in the world.



FILED DATE: 9/9/2020 12:12 PM   2020CH05784

OXF1115
UNIQUE MARKET
REFERENCE: B1115N184678



## XVIII. SUBROGATION

In the event of any payment under this **Policy**, the **Insurer** shall be subrogated to the extent of such payment to all the rights of recovery of the **Insureds**. The **Insureds** shall execute all papers required and shall do everything necessary to secure and preserve such rights, including the execution of such documents necessary to enable the **Insurer** effectively to bring suit or otherwise pursue subrogation rights in the name of the **Insureds**.

## XIX. ACTION AGAINST THE **INSURER** AND BANKRUPTCY

Except as provided in section XXII, Alternative Dispute Resolution**,** no action shall lie against the **Insurer**. No person or organization shall have any right under this **Policy** to join the **Insurer** as a party to any action against any **Insured** to determine the liability of the **Insured** nor shall the **Insurer** be impleaded by any **Insured** or its legal representatives. Bankruptcy or insolvency of any **Insured** or of the estate of any **Insured** shall not relieve the **Insurer** of its obligations nor deprive the **Insurer** of its rights or defenses under this **Policy**.

## XX. AUTHORIZATION CLAUSE

By acceptance of this **Policy**, the **Named Insured** agrees to act on behalf of all **Insureds** with respect to the giving and receiving of notice of **Claim** or termination, the payment of premiums and the receiving of any return premiums that may become due under this **Policy**, the agreement to and acceptance of endorsements, and the giving or receiving of any other notice provided for in this **Policy**, and the **Insureds** agree that the **Named Insured** shall so act on their behalf.

## XXI. ALTERATION, ASSIGNMENT AND HEADINGS

A.   No change in, modification of, or assignment of interest under this **Policy** shall be effective except when made by a written endorsement to this **Policy** which is signed by an authorized representative of the **Insurer**.

B.   The titles and headings to the various parts, sections, subsections and endorsements of this **Policy** are included solely for ease of reference and do not in any way limit, expand or otherwise affect the provisions of such parts, sections, subsections or endorsements.

## XXII.  ALTERNATIVE DISPUTE RESOLUTION

The **Insureds** and the **Insurer** shall submit any dispute or controversy arising out of or relating to this **Policy** or the breach, termination or invalidity thereof to the alternative dispute resolution ("ADR") process described in this section.

Either an **Insured** or the **Insurer** may elect the type of ADR process discussed below; provided, however, that the **Insured** shall have the right to reject the choice by the **Insurer** of the type of ADR process at any time prior to its commencement, in which case the choice by the **Insured** of ADR process shall control.

There shall be two choices of ADR process: (1) non-binding mediation administered by any mediation facility to which the **Insurer** and the **Insured** mutually agree, in which the **Insured** and the **Insurer** shall try in good faith to settle the dispute by mediation in accordance with the then-prevailing commercial mediation rules of the mediation facility; or (2) arbitration submitted to any arbitration facility to which the **Insured** and the **Insurer** mutually agree, in which the arbitration panel shall consist of three disinterested individuals. In either mediation or arbitration, the mediator or arbitrators shall have knowledge of the legal, corporate management, or insurance issues relevant to the matters in dispute. In the event of arbitration, the decision of the arbitrators shall be final and binding and provided to both parties, and the award of the arbitrators shall not include attorneys' fees or other costs. In the event of mediation, either party shall have the right to commence arbitration in accordance with this section; provided, however, that no such arbitration



OXF1115
UNIQUE MARKET
REFERENCE: B1115N184678



FILED DATE: 9/9/2020 12:12 PM   2020CH05784

shall be commenced until at least 60 days after the date the mediation shall be deemed concluded or terminated. In all events, each party shall share equally the expenses of the ADR process.

Either ADR process may be commenced in New York, New York or in the state indicated in Item 1 of the Declarations as the principal address of the **Named Insured**. The **Named Insured** shall act on behalf of each and every **Insured** in connection with any ADR process under this section.

## XXIII. INTERPRETATION

The terms and conditions of this **Policy** shall be interpreted and construed in an evenhanded fashion as between the parties. If the language of this **Policy** is deemed to be ambiguous or otherwise unclear, the issue shall be resolved in the manner most consistent with the relevant terms and conditions of this **Policy**, without regard to authorship of the language, without any presumption or arbitrary interpretation or construction in favor of either the **Insureds** or the **Insurer** and without reference to the reasonable expectations of either the **Insureds** or the **Insurer**.

PF-14387 (9/03)



OXF1115
UNIQUE MARKET
REFERENCE: B1115N184678



FILED DATE: 9/9/2020 12:12 PM   2020CH05784

## SPECIFIC ENTITY EXCLUSION

It is hereby noted and agreed that any Claims or Circumstances arising out of, due to, or involving directly or indirectly, the following entity are hereby excluded under this Policy:

Lone Wolf (dba BitIRA)

All other terms and conditions remain unchanged.



OXF1115
UNIQUE MARKET
REFERENCE: B1115N184678



FILED DATE: 9/9/2020 12:12 PM   2020CH05784

### RETROACTIVE LIMITATION CLAUSE

There shall be no liability hereunder in respect of any claim:

(a) arising out of any circumstance or occurrence which has been notified to the Insured on any other Policy of Insurance effected prior to the inception of this Policy;

(b) arising out of any circumstance or occurrence known to the Assured prior to the inception hereof and not disclosed to Underwriters at inception.

01/94
LSW559



FILED DATE: 9/9/2020 12:12 PM   2020CH05784

OXF1115
UNIQUE MARKET
REFERENCE: B1115N184678



### U.S. Terrorism Risk Insurance Act of 2002 as amended
### New & Renewal Business Endorsement

*This Endorsement is issued in accordance with the terms and conditions of the "U.S. Terrorism Risk Insurance Act of 2002" as amended, as summarized in the disclosure notice.*

In consideration of an additional premium of NIL, it is hereby noted and agreed with effect from inception that the Terrorism exclusion to which this Insurance is subject, shall not apply to any "insured loss" directly resulting from any "act of terrorism" as defined in the "U.S. Terrorism Risk Insurance Act of 2002", as amended ("TRIA").

The coverage afforded by this Endorsement is only in respect of any "insured loss" of the type insured by this Insurance directly resulting from an "act of terrorism" as defined in TRIA.  The coverage provided by this Endorsement shall expire at 12:00 midnight December 31, 2020, the date on which the TRIA Program is scheduled to terminate, or the expiry date of the policy whichever occurs first, and shall not cover any losses or events which arise after the earlier of these dates.  The Terrorism exclusion, to which this Insurance is subject, applies in full force and effect to any other losses and any act or events that are not included in said definition of "act of terrorism".

This Endorsement only affects the Terrorism exclusion to which this Insurance is subject.  All other terms, conditions, insured coverage and exclusions of this Insurance including applicable limits and deductibles remain unchanged and apply in full force and effect to the coverage provided by this Insurance.

Furthermore the Underwriter(s) will not be liable for any amounts for which they are not responsible under the terms of TRIA (including subsequent action of Congress pursuant to the Act) due to the application of any clause which results in a cap on the Underwriter's liability for payment for terrorism losses.

LMA5218
12 January 2015



OXF1115
UNIQUE MARKET
REFERENCE: B1115N184678



## SERVICE OF SUIT CLAUSE (U.S.A.)

It is agreed that in the event of the failure of the Insurers hereon to pay any amount claimed to be due hereunder, the Insurers hereon, at the request of the Insured (or Reinsured), will submit to the jurisdiction of a Court of competent jurisdiction within the United States. Nothing in this Clause constitutes or should be understood to constitute a waiver of Insurers' rights to commence an action in any Court of competent jurisdiction
in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another Court as permitted by the laws of the United States or of any State in the United States.

It is further agreed that service of process in such suit may be made upon

> Patrick Kelly - Wilson, Elser, Moskowitz, Edelman & Dicker LLP
> 555 S. Flower Street, Suite 2900, Los Angeles, CA 90071-2407

and that in any suit instituted against any one of them upon this contract, Insurers will abide by the final decision of such Court or of any Appellate Court in the event of an appeal.

The above-named are authorized and directed to accept service of process on behalf of Insurers in any such suit and/or upon the request of the Insured (or Reinsured) to give a written undertaking to the Insured (or Reinsured) that they will enter a general appearance upon Insurers' behalf in the event such a suit shall be instituted.

Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefor, Insurers hereon hereby designate the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as their true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Insured (or Reinsured) or any beneficiary hereunder arising out of this contract of insurance (or reinsurance), and hereby designate the above-named as the person to whom the said officer is authorized to mail such process or a true copy thereof.

24/4/86
NMA1998



FILED DATE: 9/9/2020 12:12 PM   2020CH05784

OXF1115
UNIQUE MARKET
REFERENCE: B1115N184678



FILED DATE: 9/9/2020 12:12 PM   2020CH05784

### NUCLEAR INCIDENT EXCLUSION CLAUSE-LIABILITY-DIRECT (BROAD) (U.S.A.)

For attachment to insurances of the following classifications in the U.S.A., its Territories and Possessions, Puerto Rico and the Canal Zone:

Owners, Landlords and Tenants Liability, Contractual Liability, Elevator Liability, Owners or Contractors (including railroad) Protective Liability, Manufacturers and Contractors Liability, Product Liability, Professional and Malpractice Liability, Storekeepers Liability, Garage Liability, Automobile Liability (including Massachusetts Motor Vehicle or Garage Liability),

not being insurances of the classifications to which the Nuclear Incident Exclusion Clause-Liability-Direct (Limited) applies.

This Policy* does not apply:

I.       Under any Liability Coverage, to injury, sickness, disease, death or destruction:

(a)      with respect to which an insured under the Policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

(b)      resulting from the hazardous properties of nuclear material and with respect to which (1) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (2) the insured is, or had this Policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

II.      Under any Medical Payments Coverage, or under any Supplementary Payments  Provision relating to immediate medical or surgical relief, to expenses incurred with respect to bodily injury, sickness, disease or death resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization.

III.     Under any Liability Coverage, to injury, sickness, disease, death or destruction     resulting from the hazardous properties of nuclear material, if:

(a)      the nuclear material (1) is at any nuclear facility owned by, or operated by or on behalf of, an insured or (2) has been discharged or dispersed therefrom;

(b)      the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or  on  behalf  of  an insured; or

(c)      the injury, sickness, disease, death or destruction arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning,





FILED DATE: 9/9/2020 12:12 PM   2020CH05784

construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (c) applies only to injury to or destruction of property at such nuclear facility.

IV.     As used in this endorsement:

"hazardous properties" include radioactive, toxic or explosive properties; "nuclear material" means source material, special nuclear material or by-product material; "source    material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act 1954 or in any law amendatory thereof; "spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor; "waste" means any waste material (1) containing by-product material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph (a) or (b) thereof; "nuclear facility" means:

(a)     any nuclear reactor,

(b)     any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,

(c)     any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

(d)     any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste, and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations; "nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.  With respect to injury to or destruction of property, the word "injury" or "destruction" includes all forms of radioactive contamination of property.

It is understood and agreed that, except as specifically provided in the foregoing to the contrary, this clause is subject to the terms, exclusions, conditions and limitations of the Policy to which it is attached.

* NOTE: As respects policies which afford liability coverages and other forms of coverage in addition, the words underlined should be amended to designate the liability coverage to which this clause is to apply.

17/3/60
NMA 1256

All other terms, clauses and conditions remain unaltered.



OXF1115
UNIQUE MARKET
REFERENCE: B1115N184678



FILED DATE: 9/9/2020 12:12 PM   2020CH05784

### RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE-LIABILITY-DIRECT (U.S.A.)

For attachment (in addition to the appropriate Nuclear Incident Exclusion Clause-Liability-Direct) to liability insurances affording worldwide coverage.

In relation to liability arising outside the U.S.A., its Territories or Possessions, Puerto Rico or the Canal Zone, this Policy does not cover any liability of whatsoever nature directly or indirectly caused by or contributed to by or arising from ionising radiations or contamination by radioactivity from any nuclear fuel or from any nuclear waste from the combustion of nuclear fuel.

13/2/64
NMA 1477

All other terms, clauses and conditions remain unaltered.



OXF1115
UNIQUE MARKET
REFERENCE: B1115N184678



FILED DATE: 9/9/2020 12:12 PM   2020CH05784

## SANCTION LIMITATION AND EXCLUSION CLAUSE

No (re)insurer shall be deemed to provide cover and no (re)insurer shall be liable to pay any claim or provide any benefit hereunder to the extent that the provision of such cover, payment of such claim or provision of such benefit would expose that (re)insurer to any sanction, prohibition or restriction under United Nations resolutions or the trade or economic sanctions, laws or regulations of the European Union, United Kingdom or United States of America.

15/09/10
LMA3100

All other terms, clauses and conditions remain unaltered.



OXF1115
UNIQUE MARKET
REFERENCE: B1115N184678



FILED DATE: 9/9/2020 12:12 PM   2020CH05784

## WAR AND TERRORISM EXCLUSION ENDORSEMENT

Notwithstanding any provision to the contrary within this insurance or any endorsement thereto it is agreed that this insurance excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any of the following regardless of any other cause or event contributing concurrently or in any other sequence to the loss;

1.      war, invasion, acts of foreign enemies, hostilities or warlike operations (whether war be declared or not), civil war, rebellion, revolution, insurrection, civil commotion assuming the proportions of or amounting to an uprising, military or usurped power; or

2.      any act of terrorism.

For the purpose of this endorsement an act of terrorism means an act, including but not limited to the use of force or violence and/or the threat thereof, of any person or group(s) of persons, whether acting alone or on behalf of or in connection with any organisation(s) or government(s), committed for political, religious, ideological or similar purposes including the intention to influence any government and/or to put the   public, or any section of the public, in fear.

This endorsement also excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any action taken in controlling, preventing, suppressing or in any way relating to 1 and/or 2 above.

If the Underwriters allege that by reason of this exclusion, any loss, damage, cost or expense is not covered by this insurance the burden of proving the contrary shall be upon the Assured.

In the event any portion of this endorsement is found to be invalid or unenforceable, the remainder shall remain in full force and effect.

08/10/01
NMA2918

All other terms, clauses and conditions remain unaltered.



OXF1115
UNIQUE MARKET
REFERENCE: B1115N184678



FILED DATE: 9/9/2020 12:12 PM   2020CH05784

### SHORT RATE CANCELLATION TABLE

Notwithstanding anything to the contrary contained herein and in consideration of the premium for which this Insurance is written it is agreed that in the event of cancellation thereof by the Assured the Earned Premium shall be computed as follows:-

A.　　For insurances written for one year:-

| Days Insurance in Force | | Percent of One Year Premium | Days Insurance in Force | | Per cent. of One Year Premium |
|---|---|---|---|---|---|
| 1 - 54 | ................................. | 25 | 192 - 196 | ................................. | 63 |
| 55 - 58 | ................................. | 26 | 197 - 200 | ................................. | 64 |
| 59 - 62 | ..... (2 months)........ | 27 | 201 - 205 | ................................. | 65 |
| 63 - 65 | ................................. | 28 | 206 - 209 | ................................. | 66 |
| 66 - 69 | ................................. | 29 | 210 - 214 | ...... (7 months) ...... | 67 |
| 70 - 73 | ................................. | 30 | 215 - 218 | ................................. | 68 |
| 74 - 76 | ................................. | 31 | 219 - 223 | ................................. | 69 |
| 77 - 80 | ................................. | 32 | 224 - 228 | ................................. | 70 |
| 81 - 83 | ................................. | 33 | 229 - 232 | ................................. | 71 |
| 84 - 87 | ................................. | 34 | 233 - 237 | ................................. | 72 |
| 88 - 91 | ..... (3 months) ...... | 35 | 238 - 241 | ................................. | 73 |
| 92 - 94 | ................................. | 36 | 242 - 246 | ...... (8 months) ...... | 74 |
| 95 - 98 | ................................. | 37 | 247 - 250 | ................................. | 75 |
| 99 - 102 | ................................. | 38 | 251 - 255 | ................................. | 76 |
| 103 - 105 | ................................. | 39 | 256 - 260 | ................................. | 77 |
| 106 - 109 | ................................. | 40 | 261 - 264 | ................................. | 78 |
| 110 - 113 | ................................. | 41 | 265 - 269 | ................................. | 79 |
| 114 - 116 | ................................. | 42 | 270 - 273 | ...... (9 months) ....... | 80 |
| 117 - 120 | ................................. | 43 | 274 - 278 | ................................. | 81 |
| 121 - 124 | ...... (4 months) ...... | 44 | 279 - 282 | ................................. | 82 |
| 125 - 127 | ................................. | 45 | 283 - 287 | ................................. | 83 |
| 128 - 131 | ................................. | 46 | 288 - 291 | ................................. | 84 |
| 132 - 135 | ................................. | 47 | 292 - 296 | ................................. | 85 |
| 136 - 138 | ................................. | 48 | 297 - 301 | ................................. | 86 |
| 143 - 146 | ................................. | 50 | 302 - 305 | ..... (10 months) ..... | 87 |
| 147 - 149 | ................................. | 51 | 306 - 310 | ................................. | 88 |
| 150 - 153 | .... (5 months) ...... | 52 | 311 - 314 | ................................. | 89 |
| 154 - 156 | ................................. | 53 | 315 - 319 | ................................. | 90 |
| 157 - 160 | ................................. | 54 | 320 - 323 | ................................. | 91 |
| 161 - 164 | ................................. | 55 | 324 - 328 | ................................. | 92 |
| 165 - 167 | ................................. | 56 | 329 - 332 | ................................. | 93 |
| 168 - 171 | ................................. | 57 | 333 - 337 | ...... (11 months) ...... | 94 |
| 172 - 175 | ................................. | 58 | 338 - 342 | ................................. | 95 |
| 176 - 178 | ................................. | 59 | 343 - 346 | ................................. | 96 |
| 179 - 182 | ...... (6 months) ...... | 60 | 352 - 355 | ................................. | 98 |
| 183 - 187 | ................................. | 61 | 356 - 360 | ................................. | 99 |
| 188 - 191 | ................................. | 62 | 361 - 365 | ...... (12 months) ..... | 100 |

B.　　For Insurances written for more or less than one year:-



FILED DATE: 9/9/2020 12:12 PM  2020CH05784

OXF1115
UNIQUE MARKET
REFERENCE: B1115N184678



1. If insurance has been in force for 12 months or less, apply the standard short rate table for annual insurances to the full annual premium determined as for an insurance written for a term of one year.

2. If insurance has been in force for more than 12 months:

   (a) Determine full annual premium as for an insurance written for a term of one year.

   (b) Deduct such premium from the full insurance premium, and on the remainder calculate the pro rata Earned Premium on the basis of the ratio of the length of time beyond one year the insurance has been in force to the length of time beyond one year for which the insurance was originally written.

   (c) Add premium produced in accordance with items (a) and (b) to obtain Earned Premium during full period insurance has been in force.

Furthermore and notwithstanding the foregoing, Underwriters shall retain the total premium for this Insurance, such total premium to be deemed earned upon inception of the Policy if any claim or any circumstance that could reasonably be the basis for a claim is reported to Underwriters under this Insurance on or before such date of cancellation.

NMA 45 (amended)

All other terms, clauses & conditions remain unchanged.



**OXF1115**
**UNIQUE MARKET**
**REFERENCE: B1115N184678**



FILED DATE: 9/9/2020 12:12 PM   2020CH05784

### <u>CHOICE OF LAW CLAUSE</u>

In consideration of the premium charged for this policy, it is hereby understood and agreed by both the Assured and Underwriters that any dispute concerning the interpretation of this policy shall be governed by the laws of the state of California, U.S.A.

All other terms, clauses and conditions remain unaltered.



OXF1115
UNIQUE MARKET
REFERENCE: B1115N184678



FILED DATE: 9/9/2020 12:12 PM   2020CH05784

## **PREMIUM PAYMENT CLAUSE**

Notwithstanding any provision to the contrary within this contract or any endorsement hereto, in respect of non payment of premium only the following clause will apply.

The (Re)Insured undertakes that premium will be paid in full to (Re)Insurers within 60 days of inception of this contract (or, in respect of instalment premiums, when due).

If the premium due under this contract has not been so paid to (Re)Insurers by the 60th day from the inception of this contract (and, in respect of instalment premiums, by the date they are due) (Re)Insurers shall have the right to cancel this contract by notifying the (Re)Insured via the broker in writing.  In the event of cancellation, premium is due to (Re)Insurers on a pro rata basis for the period that (Re)Insurers are on risk but the full contract premium shall be payable to (Re)Insurers in the event of a loss or occurrence prior to the date of termination which gives rise to a valid claim under this contract.

It is agreed that (Re)Insurers shall give not less than 30 days prior notice of cancellation to the (Re)Insured via the broker.  If premium due is paid in full to (Re)Insurers before the notice period expires, notice of cancellation shall automatically be revoked.  If not, the contract shall automatically terminate at the end of the notice period.

If any provision of this clause is found by any court or administrative body of competent jurisdiction to be invalid or unenforceable, such invalidity or unenforceability will not affect the other provisions of this clause which will remain in full force and effect.

30/09/08
LSW3001



OXF1115
UNIQUE MARKET
REFERENCE: B1115N184678



FILED DATE: 9/9/2020 12:12 PM   2020CH05784

**INFORMATION SECTION**

The following information was provided to insurer(s) to support the assessment of the risk at the time of underwriting:

- Financial Institutions Risk Protector Application originally signed & dated 11/17/2017 and re-signed & re-dated 06/27/2018

- Amended page 5 of application i.r.o. Lone Wolf (BitIRA)

- Balance Sheet & Income Statements as at 10/31/2017



OXF1115
UNIQUE MARKET
REFERENCE: B1115N184678



FILED DATE: 9/9/2020 12:12 PM   2020CH05784

**SECURITY DETAILS**

**INSURER'S
LIABILITY:**

<u>**LMA3333**</u>

**(Re)insurer's liability several not joint**

The liability of a (re)insurer under this contract is several and not joint with other (re)insurers party to this contract. A (re)insurer is liable only for the proportion of liability it has underwritten. A (re)insurer is not jointly liable for the proportion of liability underwritten by any other (re)insurer. Nor is a (re)insurer otherwise responsible for any liability of any other (re)insurer that may underwrite this contract.

The proportion of liability under this contract underwritten by a (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together) is shown next to its stamp. This is subject always to the provision concerning "signing" below.

In the case of a Lloyd's syndicate, each member of the syndicate (rather than the syndicate itself) is a (re)insurer. Each member has underwritten a proportion of the total shown for the syndicate (that total itself being the total of the proportions underwritten by all the members of the syndicate taken together). The liability of each member of the syndicate is several and not joint with other members. A member is liable only for that member's proportion. A member is not jointly liable for any other member's proportion. Nor is any member otherwise responsible for any liability of any other (re)insurer that may underwrite this contract. The business address of each member is Lloyd's, One Lime Street, London EC3M 7HA. The identity of each member of a Lloyd's syndicate and their respective proportion may be obtained by writing to Market Services, Lloyd's, at the above address.

**Proportion of liability**

Unless there is "signing" (see below), the proportion of liability under this contract underwritten by each (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together) is shown next to its stamp and is referred to as its "written line".

Where this contract permits, written lines, or certain written lines, may be adjusted ("signed"). In that case a schedule is to be appended to this contract to show the definitive proportion of liability under this contract underwritten by each (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together). A definitive proportion (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of a Lloyd's syndicate taken together) is referred to as a "signed line". The signed



FILED DATE: 9/9/2020 12:12 PM   2020CH05784

OXF1115
UNIQUE MARKET
REFERENCE: B1115N184678



lines shown in the schedule will prevail over the written lines unless a proven error in calculation has occurred.

Although reference is made at various points in this clause to "this contract" in the singular, where the circumstances so require this should be read as a reference to contracts in the plural.

**ORDER HEREON:**   100%

**BASIS OF
WRITTEN LINES:**   Percentage of whole.

**WRITTEN
LINES:**   In a co-insurance placement, following insurers may, but are not obliged to, follow the premium charged by the slip leader.

Insurers may not seek to guarantee for themselves terms as favourable as those which others subsequently achieve during the placement.

**SIGNING
PROVISIONS:**   In the event that the written lines hereon exceed 100% of the order, any lines written "to stand" will be allocated in full and all other lines will be signed down in equal proportions so that the aggregate signed lines are equal to 100% of the order without further agreement of any of the insurers.

However:

a)   in the event that the placement of the order is not completed by the commencement date of the period of insurance then all lines written by that date will be signed in full;

b)   the insured may elect for the disproportionate signing of insurers' lines, without further specific agreement of insurers, providing that any such variation is made prior to the commencement date of the period of insurance, and that lines written "to stand" may not be varied without the documented agreement of those insurers.

The signed lines resulting from the application of the above provisions can be varied, before or after the commencement date of the period of insurance, by the documented agreement of the insured and all insurers whose lines are to be varied. The variation to the contracts will take effect only when all such insurers have agreed, with the resulting variation in signed lines commencing from the date set out in that agreement.



**OXF1115**
**UNIQUE MARKET**
**REFERENCE: B1115N184678**



FILED DATE: 9/9/2020 12:12 PM   2020CH05784

| Signed Line % | Written Line and Security |
|---|---|

CHUBB ⚓ CGM 2488 4/8/18.

**Chubb Global Markets - Financial Lines**
a trading name of Chubb Underwriting Agencies Ltd

50/. AKDP6IUS1907D4.

TALBOT 14/08/18 per PON dated 4th July 2018.
TALBOT
An AIG company ASB Per AXW. ⚓ TAL 1183
50%   C F K 2 6 0 1 1 6 A 1 8
A A A N N N N N A N N
FI@talbotuw.com